FILED
United States Court of Appeals
Tenth Circuit

December 13, 2021

Christopher M. Wolpert
Clerk of Court

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT
_____

| | |
|---|---|
| ANDY KERR, Colorado State Representative; NORMA V. ANDERSON; JANE M. BARNES, member Jefferson County Board of Education; ELAINE GANTZ BERMAN, member State Board of Education; ALEXANDER E. BRACKEN; WILLIAM K. BREGAR, member Pueblo District 70 Board of Education; BOB BRIGGS, Westminster City Councilman; BRUCE W. BRODERIUS, member Weld County District 6 Board of Education; TRUDY B. BROWN; JOHN C. BUECHNER, Ph.D., Lafayette City Councilman; STEPHEN A. BURKHOLDER; RICHARD L. BYYNY, M.D.; LOIS COURT, Colorado State Representative; THERESA L. CRATER; ROBIN CROSSAN, member Steamboat Springs RE-2 Board of Education; RICHARD E. FERDINANDSEN; STEPHANIE GARCIA, member Pueblo City Board of Education; KRISTI HARGROVE; DICKEY LEE HULLINGHORST, Colorado State Representative; NANCY JACKSON, Arapahoe County Commissioner; CLAIRE LEVY, Colorado State Representative; MARGARET MARKERT, Aurora City Councilwoman, AKA Molly Markert; MEGAN J. MASTEN; MICHAEL MERRIFIELD; MARCELLA L. MORRISON, AKA Marcy L. Morrison; JOHN P. MORSE, Colorado State Senator; PAT NOONAN; BEN PEARLMAN, Boulder County Commissioner; WALLACE PULLIAM; FRANK WEDDIG, Arapahoe County | No. 17-1192 (D.C. No. 1:11-CV-01350-RM-NYW) (D. Colo.) |

Commissioner; PAUL WEISSMANN; JOSEPH W. WHITE; CHEYENNE WELLS RE-5 SCHOOL DISTRICT BOARD OF EDUCATION; SUSAN LONTINE; DENVER COUNTY PUBLIC SCHOOLS BOARD OF EDUCATION; K. C. BECKER; BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY; BOULDER VALLEY SCHOOL DISTRICT RE-2 BOARD OF EDUCATION; GUNNISON COUNTY METROPOLITAN RECREATION DISTRICT; LESLIE HEROD; PUEBLO CITY DISTRICT 60 BOARD OF EDUCATION; CHRISTOPHER J. HANSEN; GUNNISON WATERSHED RE-IJ SCHOOL DISTRICT BOARD OF EDUCATION; COLORADO SPRINGS DISTRICT 11 BOARD OF EDUCATION; POUDRE SCHOOL DISTRICT BOARD OF EDUCATION; PUEBLO COUNTY SCHOOL DISTRICT 70 BOARD OF EDUCATION; WILLIAM G. KAUFMAN,

       Plaintiffs - Appellants,

v.

JARED POLIS, Governor of Colorado in his official capacity,

       Defendant - Appellee.

-------------------------------

COLORADO ASSOCIATION OF

SCHOOL EXECUTIVES; COLORADO
ASSOCIATION OF SCHOOL
BOARDS; THE COLORADO UNION
OF TAXPAYERS FOUNDATION;
MOUNTAIN STATES LEGAL
FOUNDATION,

    Amici Curiae.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 11-cv-01350-RM-NYW)**

---

Sarah M. Mercer (David E. Skaggs, Dentons US LLP, Denver Colorado, Mark P.
Johnson, Dentons US LLP, Kansas City, Missouri, Herebert L. Fenster, Covington &
Burling, Washington, D.C., Michael F. Feeley, Carrie E. Johnson, and John A.
Herrick, Brownstein Hyatt Farber Schreck LLP, Denver Colorado, with her on the
supplemental brief), Brownstein Hyatt Farber Schreck LLP, Denver, Colorado, for
Appellants.

Michael Kotlarczyk, Assistant Attorney General (Philip J. Weiser, Attorney General,
Eric R. Olson, Solicitor General, Megan Paris Rundlet, Assistant Solicitor General,
Stephanie Lindquist Scoville and Kathleen Spalding, Senior Assistant Attorneys
General, Melody Joy Fields and Shelby A. Krantz, Assistant Attorney General
Fellows, with him on the supplemental briefs), Colorado Department of Law, Denver,
Colorado, for Appellee.

---

Before **TYMKOVICH**, Chief Judge, **BRISCOE, HARTZ, HOLMES,
BACHARACH, PHILLIPS, McHUGH, MORITZ**, and **EID**, Circuit Judges.

---

**TYMKOVICH**, Chief Judge.[1]

---

    [1]Chief Judge Tymkovich and Judges Hartz, Holmes, Bacharach, McHugh,
Moritz, and Eid join the opinion of the court and affirm the dismissal below without
prejudice.  Judge Briscoe, joined by Judge Phillips, dissents and would reverse the
dismissal below and remand.  Chief Judge Tymkovich, joined by Judges Hartz,
Holmes, and Eid, concurs with the opinion of the court but also would convert the
dismissal below to one with prejudice.  Chief Judge Tymkovich, joined by Judges
Hartz and Eid, would further conclude that the Plaintiffs' claim was nonjusticiable
under the political question doctrine.  Judge Bacharach, joined by Judges McHugh
and Moritz, concurs, explaining why the court affirmed without prejudice.

Popular knowledge about the American legal system is that everyone can have his or her day in court. But a decade after various Plaintiffs challenged Colorado's Taxpayer's Bill of Rights (TABOR), we have yet to determine who, if anyone, can have that day in this case.

In their complaint, first filed in 2011 and most recently amended in 2016, the Plaintiffs—who include school districts and other political subdivisions—allege that TABOR's requirement of voter approval for tax increases deprives them of a Republican Form of Government protected by the United States Constitution and Colorado's statehood Enabling Act. According to the Plaintiffs, TABOR's constraints and voter-involvement in tax and spending policy effectively deprive them and the people of the State of Colorado of a truly representative government.

The Governor responded by bringing a motion to dismiss the claims for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). He argued that the Plaintiffs lacked standing to sue the State of Colorado under the Republican Form of Government Clause—also known as the Guarantee Clause, *see* U.S. Const. art. IV, § 4—because political subdivisions cannot sue their parent state.

Applying this circuit's precedent, the district court reviewed the complaint to determine whether the various school districts and other political subdivisions had "political subdivision standing." Based on this doctrine, the court dismissed the complaint for lack of subject-matter jurisdiction. It concluded that neither the

Guarantee Clause nor the Enabling Act authorized the political subdivisions to sue the state.  A panel of this court rejected that conclusion, finding that the Plaintiffs met our requirements for political subdivision standing.

We affirm the district court's dismissal of the Plaintiffs' claims without prejudice.  We disagree with the district court's reasoning on standing and therefore it erred in dismissing the claims under Rule 12(b)(1).  Nevertheless, it is appropriate to convert the Governor's Rule 12(b)(1) motion to a motion to dismiss under Rule 12(b)(6).  In doing so, we depart from our previous cases in which we treated the limits on actions political subdivisions can bring against their parent states as a threshold inquiry about the court's subject-matter jurisdiction.  Instead, we conclude these limits are part of a merits inquiry that addresses whether any constitutional or statutory provisions allow political subdivisions to bring a cause of action against their parent state.  The Plaintiffs have not identified any provision in the Constitution or the Enabling Act authorizing Colorado's political subdivisions to challenge TABOR.  Thus, the Plaintiffs have failed to state a claim on which relief can be granted.

A majority of this en banc panel agrees that we should affirm the disposition based on Plaintiff's failure to state a claim.  Thus, the dismissal below is affirmed.

# I.  Background

## A.  Factual Background

After ten years of litigation, this case is stuck in neutral.  Despite carving a well-worn path from the district court, to this court, to the Supreme Court, and back, we have yet to finally decide whether any of the Plaintiffs are entitled to have the merits of their claims considered.  A brief background of this litigation history provides helpful context for the scope of our decision today and why the day has come to affirm the dismissal of the complaint.

TABOR—codified at Article X, Section 20 of the Colorado Constitution—was adopted by voter initiative in 1992.  TABOR codifies various rules that place the taxing power directly in the hands of the people, limiting the power of the state and its political subdivisions to raise revenue.  Under TABOR, government entities must obtain voter approval for "any new tax, tax rate increase, mill levy above that for the prior year, valuation for assessment ratio increase for a property class, or extension of an expiring tax, or a tax policy change directly causing a net tax revenue gain to any district."  Colo. Const. art. X, § 20, cl. 4(a).  TABOR also places limits on the state's year-to-year spending, *id.* at cl. 7(a), and the use of excess revenue by the state and its political subdivisions, *id.* at cl. 7(d).  Because it was passed as a constitutional amendment, TABOR can be revoked or amended only by voter approval.  *Id.* at art. XIX, § 2 ("[A]mendments shall be submitted to the registered electors of the state for their approval or rejection, and such as are approved by a majority of those voting

6

thereon . . . shall become part of this constitution."). Though numerous efforts have been made to repeal TABOR since its enactment, it has proved remarkably durable. As recently as November 2020 voters have rejected efforts to significantly overhaul or repeal TABOR.

### B. Procedural Background

In 2011, the Plaintiffs—who include individual state legislators, educators, and various school districts and other political subdivisions—brought suit against then-Governor John Hickenlooper, seeking injunctive and declaratory relief from TABOR. They claimed that TABOR violates the guarantee of a "Republican Form of Government" found in Article IV, Section 4 of the United States Constitution. According to the Plaintiffs, TABOR also violates a similar guarantee found in Colorado's Enabling Act. *See* 18 Stat. 474, § 4 (declaring that the state's "constitution shall be republican in form"). They argue that under the Supremacy Clause, the Enabling Act—as federal law—should trump any conflicting state law. *See* U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land.").

The Governor moved to dismiss the complaint, arguing the Plaintiffs lacked standing. The district court disagreed with the Governor, concluding that the individual state legislators had standing to challenge TABOR. The Governor appealed that decision to this court, which affirmed the district court. *See Kerr v. Hickenlooper* (*Kerr I*), 744 F.3d 1156 (10th Cir. 2014), *vacated,* 576 U.S. 1079 (2015). The

Governor then appealed to the Supreme Court, which vacated the *Kerr I* panel's decision and remanded back to this court for consideration of legislative standing in light of *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 576 U.S. 787 (2015). *See Hickenlooper v. Kerr*, 576 U.S. 1079 (2015). On remand, this court applied *Arizona* and concluded that "individual legislators may not support standing by alleging only an institutional injury." *Kerr v. Hickenlooper* (*Kerr II*), 824 F.3d 1207, 1214 (10th Cir. 2016). Because this was the sole injury the individual legislators had alleged, the *Kerr II* panel reversed the district court's standing decision regarding these Plaintiffs. The panel remanded for the district court to determine whether any of the remaining Plaintiffs had standing. On remand, the Governor moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1), again arguing the court lacked subject-matter jurisdiction to hear the claims.

The district court was faced with the same question it had addressed years earlier: did any of the Plaintiffs have standing to challenge TABOR? Regarding the remaining individual Plaintiffs, the district court noted that "plaintiffs make no effort to discuss, analyze, or even ruminate on how the elected officials, educators, and citizens have standing[.]" *Kerr v. Hickenlooper*, 259 F. Supp. 3d 1178, 1183 (D. Colo. 2017). Without any allegations about what injuries these Plaintiffs had suffered, the court determined these Plaintiffs lacked standing. *Id.* at 1184 ("The Court should not have to wade into that analysis when plaintiffs have voluntarily decided to stay dry on the riverbank.").

8

But the district court found the political subdivisions—eight school districts, a board of county commissioners, and a recreation district—had Article III standing. The Plaintiffs had adequately alleged that TABOR was causing the political subdivisions a redressable injury in fact. *Id.* at 1186. Still, the district court ultimately dismissed the complaint. The court recognized that under this circuit's prior cases, political subdivisions must clear additional hurdles when bringing a claim against their parent state. *Id.* at 1186–87 (citing *Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619 (10th Cir. 1998); *City of Hugo v. Nichols*, 656 F.3d 1251 (10th Cir. 2011)). Based on *Branson* and *Hugo*, the district court determined that "a political subdivision must be seeking to enforce rights afforded it in a federal statute" to establish standing. *Kerr*, 259 F. Supp. 3d at 1188. The court found no such grant of rights to the political subdivisions in this case. Without any such rights to enforce, the court found "that the [political subdivision] plaintiffs do not have political subdivision standing to pursue this action[.]" *Id.* at 1191. The court granted the Governor's 12(b)(1) motion and dismissed the action for lack of subject-matter jurisdiction.

The Plaintiffs appealed to this court, arguing they had met the requirements for political subdivision standing. Over a dissent, a panel of this court reversed the district court's dismissal for lack of subject-matter jurisdiction and remanded to the district court for further proceedings. *See Kerr v. Polis* (*Kerr III*), 930 F.3d 1190, 1200 (10th Cir. 2019) (Holmes, J., dissenting). The *Kerr III* panel concluded dismissal was inappropriate at this stage. To determine who the Enabling Act was intended to

9

protect, the panel reasoned it would need to delve into what a Republican Form of Government is. *Id.* at 1196. Because the panel regarded the jurisdictional issues as deeply intertwined with the underlying merits, it concluded the district court had prematurely dismissed the case for lack of standing. *See id.* ("[W]e cannot decisively determine if the political subdivision plaintiffs here are excepted from the usual bar to political subdivisions standing because doing so would require impermissibly delving into the merits.").

After the *Kerr III* panel issued its decision, the Governor petitioned for rehearing en banc. We granted the petition and asked the parties to specifically brief whether political subdivision standing is a jurisdictional limitation and what political subdivision standing requires.

## II. Legal Framework

Before addressing what political subdivision standing is and where it is best situated within our analysis, we address the threshold question of subject-matter jurisdiction.

### A. Subject-Matter Jurisdiction

"Federal courts do not wield plenary jurisdiction over every slight or suit." *Hydro Resources, Inc. v. EPA*, 608 F.3d 1131, 1144 (10th Cir. 2010) (en banc). "The Constitution gives federal courts the power to adjudicate only genuine 'Cases' and 'Controversies.'" *California v. Texas*, 141 S. Ct. 2104, 2113 (2021) (quoting U.S. Const. Art. III, § 2). "That power includes the requirement that litigants have

standing." *Id.* To have standing, a plaintiff must establish three things: (1) he suffered an "injury in fact"—"an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) the injury is "fairly traceable to the challenged action of the defendant"; and (3) it is likely the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks and citations omitted).

The Governor does not deny that the political subdivisions have established standing. But "[b]ecause Article III standing is a jurisdictional issue, we must satisfy ourselves that it exists here." *Felix v. City of Broomfield*, 841 F.3d 848, 854 (10th Cir. 2016). We agree with the district court that the political subdivisions have satisfied the constitutional standing requirements. They alleged a cognizable injury in fact: "incurring costs and expenses necessary to present matters . . . to the voters for their decision." Aplt. App., Vol. XI at 17 (Fourth Amended Complaint); *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) ("[C]ertain harms readily qualify as concrete injuries under Article III. The most obvious are traditional tangible harms, such as physical harms and monetary harms."). These costs are fairly traceable to the requirements of TABOR. And, if TABOR were struck down, the injury would be redressed.[2]

---

[2] The Governor raises another jurisdictional issue: whether the Plaintiffs' claims are nonjusticiable political questions. Usually, we must address jurisdictional issues before addressing the merits of a case. But both we and the Supreme Court have treated justiciability as an exception to that general rule. *See New York v. United States*, 505 U.S. 144, 186 (1992) ("[E]ven indulging the assumption that the

11

### B. Political Subdivision Standing

Up to this point, the parties and courts have treated political subdivision standing as an issue of subject-matter jurisdiction. We depart from this approach. The limits on when political subdivisions can bring suit that we previously referred to as "political subdivision standing" go to the merits of a case—whether a plaintiff has stated a claim on which relief can be granted—not to jurisdiction. Evaluating the Plaintiffs' claims through this lens, we conclude the political subdivisions have not identified any constitutional or statutory provisions that authorize them to bring the present cause of action. Therefore, we affirm the dismissal of the Plaintiffs' complaint for the alternate grounds of failure to state a claim under Rule 12(b)(6).

Below, we first describe the historical evolution of "political subdivision standing" as a distinct consideration when subordinate governmental entities sue their parent states (Section II.B.1), then discuss why this inquiry goes to the merits of the Plaintiffs' claim, rather than the court's jurisdiction (Section II.B.2), then articulate the proper framework for determining whether a political subdivision has stated a viable claim against its parent state (Section II.B.3), then address why we can modify the

Guarantee Clause provides a basis upon which a State or its subdivisions may sue to enjoin the enforcement of a federal statute, petitioners have not made out such a claim in these cases."); *Hanson v. Wyatt*, 552 F.3d 1148, 1162 (10th Cir. 2008) ("[W]e believe that it was appropriate for us to decide the matter on the merits without first addressing justiciability.").

We take the same approach here. Even if we assume the claims under the Guarantee Clause are justiciable, we conclude the Plaintiffs' claims fail on the merits.

12

district court's judgment from a dismissal under Rule 12(b)(1) to a dismissal under Rule 12(b)(6) (Section III.A), and finally explain why the Plaintiffs here fail to state a claim under either the Constitution (Section III.B) or the Enabling Act (Section III.C).

### 1. History

Almost a century ago, the Supreme Court considered if and when political subdivisions could sue their parent states. In *City of Trenton v. State of New Jersey*, the city of Trenton claimed a New Jersey statute regarding distribution of water from the Delaware River violated the Contracts Clause of the United States Constitution and the Fourteenth Amendment's Due Process Clause. 262 U.S. 182, 183–84 (1923). The Supreme Court concluded the city was unable to sue New Jersey under either constitutional provision. It explained that "[a] municipality is merely a department of the state, and the state may withhold, grant or withdraw powers and privileges as it sees fit." *Id.* at 187. Given this unique relationship between the city and the state, the Court reasoned that "[t]he power of the State, unrestrained by the contract clause or the Fourteenth Amendment, over the rights and property of cities held and used for 'governmental purposes' cannot be questioned." *Id.* at 188.

A decade later, the Court took this reasoning a step further in *Williams v. Mayor and City Council of Baltimore*. 289 U.S. 36 (1933). Maryland's legislature had adopted a statute exempting railroad property owned by the Washington, Baltimore, and Annapolis Electric Railroad Company from county and city taxes. Baltimore challenged the validity of the statute, claiming it violated the Fourteenth Amendment's

13

promise of equal protection.  The Court concluded the city could not bring this constitutional claim against its parent state: "A municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator."  *Id.* at 40 (citing *Trenton*, 262 U.S. 182).

While these cases expressly disallowed political subdivisions from bringing suit against their parent state under the Contracts Clause and the Fourteenth Amendment, they were silent as to the viability of such claims brought under other constitutional provisions or federal statutes.  At least several circuits, including ours, have since concluded that *Trenton* and *Williams* do not establish a complete bar on all suits by political subdivisions against their parent states.  *See Hous. Auth. of Kaw Tribe of Indians of Okla. v. City of Ponca City*, 952 F.2d 1183 (10th Cir. 1991) (allowing political subdivisions to sue their parent state when a federal statute and state statute conflict); *Branson*, 161 F.3d 619 (same); *see also Rogers v. Brockette*, 588 F.2d 1057 (5th Cir. 1979) (same); *United States v. Alabama*, 791 F.2d 1450, 1454–55 (11th Cir. 1986) (same); *but see City of San Juan Capistrano v. Cal. Pub. Utils. Comm'n*, 937 F.3d 1278, 1280 (9th Cir. 2019) ("[W]e have consistently held that political subdivisions lack standing to challenge state law on constitutional grounds in federal court."  (citing *City of S. Lake Tahoe v. Cal. Tahoe Reg'l Plan. Agency*, 625 F.2d 231, 233 (9th Cir. 1980))).

In *Kaw Tribe*, *Branson*, and *Hugo*, we left open a narrow pathway for political subdivisions to sue their parent state.  In *Kaw Tribe*, we considered constitutional and

14

statutory claims brought by a housing authority against a nearby city. We explained

that even though the housing authority was not directly suing the parent state, the suit

against another political subdivision should be evaluated the same way: "Simply

because we are now faced with a challenge brought by a state agency against a

municipality rather than a challenge by a municipality against an arm of the state or

state statute does not warrant a different outcome." *Kaw Tribe*, 952 F.2d at 1189.

Based on this understanding, we easily dispatched of the housing authority's claims

under the Fourteenth Amendment: "unless expressly granted the ability by its creating

state, a political subdivision cannot assert federal constitutional rights in opposition to

state action." *Id.* at 1192.

We then moved on to analyze whether the housing authority could sustain a suit

against another political subdivision under § 3613 of the Fair Housing Act.  *See* 42

U.S.C. § 3613(a)(1)(A).  Although the plain text of § 3613 did not authorize the

housing authority to bring a suit, this court concluded the housing authority could

proceed with its claim against the other political subdivision.  *Kaw Tribe*, 952 F.2d at

1195 ("We thus do not share the city's belief that by not specifically including within

the definition of 'person' the terms 'governments, governmental agencies and political

subdivisions' Congress meant to exclude those entities from filing suit under 42 U.S.C.

§ 3613.").  Looking to the Fair Housing Act's legislative history and underlying

purpose, we concluded that it was "clear that Congress intended to summon all

available forces to vindicat[e] a policy that Congress considered to be of the highest

15

priority." *Id.* (internal quotation marks omitted). Thus, the housing authority was able to overcome the city's motion to dismiss.

In *Branson*, a group of school districts challenged a state constitutional amendment that would change the standard for managing land holdings held in a trust for Colorado's public schools. The Governor argued the school districts lacked standing as political subdivisions. *Branson*, 161 F.3d at 628 ("[T]he defendants contend that the school district plaintiffs have no right to invoke the power of the federal courts in this case because the school districts are mere creatures of their creating state, and as such, federal doctrines of political subdivision standing prevent them from suing their parent state."). A panel of this court disagreed. We explained that "both *Williams* and *Trenton* stand only for the limited proposition that a municipality may not bring a constitutional challenge against its creating state when the constitutional provision that supplies the basis for the complaint was written to protect individual rights, as opposed to collective or structural rights." *Id.* But neither *Williams* nor *Trenton* addressed whether political subdivisions could otherwise bring suit against their parent states. The school districts' challenge to the state action was based on a federal statute, Colorado's Enabling Act. And such a statute could be enforced through the Constitution's Supremacy Clause. The Enabling Act granted more than 4.6 million acres of school lands to the state of Colorado specifically "for the support of common schools." 18 Stat. at 475, § 5. We concluded the school districts could proceed with their claim because, based on the plain language of the

16

Enabling Act, they were "essentially the beneficiaries of the federal trust at issue[.]"
*Id.* (internal quotation marks omitted).

We subsequently addressed political subdivision standing in *Hugo*. There, the
city brought a Dormant Commerce Clause challenge against the state of Oklahoma.
The state sought to dismiss the city's claim based on political subdivision standing.
We agreed that the city lacked standing, explaining "the Supreme Court has made clear
that the Constitution does not contemplate the rights of political subdivisions as
against their parent states[.]" *Hugo*, 656 F.3d at 1258.

But pointing to *Branson*, we explained that political subdivision standing did
not represent a categorical bar to all suits by political subdivisions against their parent
states. *Id.* at 1255 ("Under the doctrine of political subdivision standing, federal courts
lack jurisdiction over *certain controversies* between political subdivisions and their
parent states." (emphasis added)). Rather, we concluded we have jurisdiction to
consider such claims when "the source of substantive rights [is] a federal statute
directed at protecting political subdivisions, and the Supremacy Clause [is] invoked
merely to guarantee, as a structural matter, that federal law predominates over
conflicting state law." *Id.* at 1257. But such claims can stand "when Congress has
enacted statutory law *specifically providing rights to municipalities*." *Id.* (emphasis
added).

### 2. Contemporary Doctrine

This was the analytical framework the district court and the *Kerr III* panel used
when evaluating the Plaintiffs' complaint based on the Governor's motion to dismiss

17

under 12(b)(1). Both treated the question of political subdivision standing as part of the threshold jurisdictional inquiry courts must make in every case. But, in light of recent Supreme Court precedent and further consideration, we have concluded this approach is no longer tenable.

The meaning of "standing" has evolved across the years. In *Williams*, the Supreme Court used the language of standing when discussing the inability of Baltimore to bring an action based on the Constitution against Maryland. *See* 289 U.S. at 47 (indicating the city was "without standing to invoke the protection of the Federal Constitution"). But at that time, courts did not consider standing to be a jurisdictional inquiry. Instead, "[a] party had standing or a 'right to sue' if it was correct in its claim on the merits that the statutory or constitutional provision in question protected its interests; standing was not seen as a preliminary or threshold question." *Rogers*, 588 F.2d at 1070; *see also* William Fletcher, *The Structure of Standing*, 98 Yale L.J. 221, 224–28 (1988) (discussing the historical evolution of standing doctrine).

The Supreme Court has acknowledged this gradual transformation of standing doctrine. *See Lexmark International, Inc. v. Static Control Components, Inc.,* 572 U.S. 118 (2014). In *Lexmark*, the Court had to determine whether a federal statute authorized the plaintiffs to bring suit against the defendant. The Court explained that not just anyone could sue based on the statute. Rather, the statute "extends only to plaintiffs whose interests fall within the zone of interest protected by the law invoked." *Id.* at 130 (internal quotation marks omitted). In cases decided prior to *Lexmark*, the Court had treated the zone-of-interests test as a threshold jurisdictional question of

18

"statutory standing" or "prudential standing." *Id.* at 128 n.4. The Court abandoned

this practice in *Lexmark*, concluding the zone-of-interests test went to the question of

"whether a legislatively conferred cause of action encompasses a particular plaintiff's

claim," not whether a federal court has jurisdiction to hear the case. *Id.* at 127; *see*

*also id.* ("'[P]rudential standing' is a misnomer as applied to the zone-of-interests

analysis, which asks whether this particular class of persons has a right to sue under

this substantive statute." (internal quotation marks omitted; alterations incorporated));

*TransUnion*, 141 S. Ct. at 2205 ("For standing purposes, therefore, an important

difference exists between (i) a plaintiff's statutory cause of action to sue a defendant

over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete

harm because of the defendant's violation of federal law.").

　　Following *Lexmark*, we now have greater clarity about which issues

anachronistically labeled as "standing" are actually jurisdictional and which are more

appropriately considered when evaluating whether a plaintiff's claim is encompassed

by a given cause of action. We believe the "standing" in "political subdivision

standing" is a misnomer. *See Rogers*, 588 F.2d at 1068 (*Trenton* and its progeny "do

not deal with 'standing,' in the sense in which we use the term, at all."). "In speaking

of 'standing,' cases in the . . . *Trenton* line meant only that, on the merits, the

municipality had no rights under the particular constitutional provisions it invoked."

*Id.* at 1070. This is not a jurisdictional inquiry. Rather, like the zone-of-interests test

at issue in *Lexmark*, this inquiry is a way of discerning whether political subdivisions

19

have alleged a cause of action against their parent state in a given case.[3]  We now hold

that what we formerly referred to as political subdivision standing is an inquiry going

to the merits of the case, not the court's jurisdiction.  Under this inquiry, we no longer

ask whether a political subdivision has standing.  We ask whether the political

subdivision has a cause of action.

> 3.  *Suits Brought by Political Subdivisions Against Their Parent States*

We adopt the two-step process from *Hugo* to analyze whether a political

subdivision has a cause of action against its parent state.[4]  First, we must determine

whether the political subdivision's cause of action rests on a substantive constitutional

provision; if so, the claim cannot proceed.[5]  *See Hugo*, 656 F.3d at 1258 ("[T]he

---

[3]  In supplemental briefing, both parties endorsed this understanding of the inquiry.

[4] While the reason for inquiring into what law authorizes a political subdivision to sue its parent state has changed—addressing whether the plaintiff has a cause of action rather than whether we have jurisdiction—the actual substance of the inquiry has not.  *Hugo*, though addressed to subject-matter jurisdiction, correctly captured the essential question that needs answering in these cases: does the political subdivision have a cause of action?

[5]  According to Judge Briscoe's Dissent, we ought to limit the rule to those constitutional provisions expressly ruled on by the Supreme Court and this court.  Judge Briscoe's Dissent argues that a general rule prohibiting suits by political subdivisions against their parent states based on substantive constitutional provisions goes too far.  In adopting the rule stated by this court in *Hugo*, we are not indulging unreasoned dicta.  The Supreme Court has explained on multiple occasions why substantive constitutional claims by a political subdivision against its parent state cannot stand.  *See, e.g.*, *Hunter v. City of Pittsburgh*, 207 U.S. 161, 179 (1907) ("[T]he state is supreme, and its legislative body, conforming its action to the state Constitution, may do as it will, unrestrained by any provision of the Constitution of the United States."); *Trenton*, 262 U.S. at 187 ("A municipality is merely a department of the state, and the state may withhold, grant or withdraw powers and privileges as it sees fit.  However great or small its sphere of action, it remains the creature of the state exercising and holding powers and privileges subject to the

Supreme Court has made clear that the Constitution does not contemplate the rights of political subdivisions as against their parent states[.]"); *see also Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 629 (1819) (Marshall, J.) ("That the framers of the constitution did not intend to restrain the states in the regulation of their civil institutions, adopted for internal government, and that the instrument they have given us, is not to be so construed, may be admitted."); *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 363 (2009) ("[A] political subdivision . . . is a subordinate unit of government . . . 'created by a state for the better ordering of government, [and] has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator.'" (quoting *Williams*, 389 U.S. at 40)).[6]

sovereign will.").

In each of these cases the Supreme Court was faced with a particular constitutional provision. *Hunter*, 207 U.S. 161 (Contracts Clause); *Trenton*, 262 U.S. 182 (Fourteenth Amendment and Contracts Clause); *Williams*, 289 U.S. 36 (Fourteenth Amendment). But the Supreme Court's broader pronouncements that political subdivisions cannot bring constitutional claims against their parent states were not drive-by dicta. They reflected the reasoned consideration of the Court. We are far from alone in reaching this conclusion. *See San Juan Capistrano*, 937 F.3d at 1280 ("[W]e have consistently held that political subdivisions lack standing to challenge state law on constitutional grounds in federal court."); *Greater Heights Academy v. Zelman*, 522 F.3d 678, 680 (6th Cir. 2008) ("It is well established that political subdivisions cannot sue the state of which they are part under the United States Constitution."); *City of New York v. Richardson*, 473 F.2d 923, 929 (2d Cir. 1973) (explaining that *Williams'* bar on constitutional claims by political subdivisions against parent states "remains controlling authority when the challenged statute is the work of a State legislature").

[6] The Plaintiffs rely extensively on the distinction between "individual" and "structural/collective" rights discussed in *Branson*. But the Plaintiffs read more into this language than it is worth. The only distinction the *Branson* court intended to make by using these terms was between claims based on substantive provisions of the Constitution and claims based on a federal statute. *See Hugo*, 656 F.3d at 1257 (Where claims by a political subdivision have proceeded "the Supremacy Clause was

21

Second, if the political subdivision brings its suit under a federal statute, we must determine whether Congress specifically intended to create a cause of action for political subdivisions. A federal statute authorizes a political subdivision to sue its parent state if the statute is "directed at protecting political subdivisions[.]" *Hugo*, 656 F.3d at 1257.

The Plaintiffs disagree with this formulation of the test for determining whether political subdivisions have a cause of action. Instead, they propose we use *Lexmark*'s zone-of-interests test to determine whether a political subdivision has a cause of action under a federal statute. Under the zone-of-interests test, courts must determine whether a statute actually provides the plaintiff with a cause of action. In making this determination, courts are to "apply traditional principles of statutory interpretation" "to determine the meaning of the congressionally enacted provision creating a cause of action." *Lexmark*, 572 U.S. at 128. This inquiry is not "meant to be especially demanding," and "the benefit of any doubt goes to the plaintiff." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (internal quotation marks omitted).

We decline the Plaintiffs' invitation to adopt the zone-of-interests test. Although this test may be appropriate in many cases involving statutorily granted

invoked merely to guarantee, as a structural matter, that federal law predominates over conflicting state law. *This understanding of the Supremacy Clause* informs the use of the words 'structural' and 'collective' to describe the rights political subdivisions may vindicate in federal court against their parent states." (emphasis added)). The mere fact that a claim based on the guarantee of a Republican Form of Government can be construed as "structural" does not mean the political subdivisions have a constitutional cause of action outside of the Supremacy Clause.

22

causes of action, we cannot simply transpose it onto claims brought by political subdivisions against their parent states. To be sure, *Trenton* and *Williams* do not categorically bar political subdivisions from suing their parent state in all instances. But the federalism concerns underlying these decisions have continuing relevance for determining whether a political subdivision has a cause of action against its parent state.

Political subdivisions are not just like any other plaintiff, particularly when they sue their parent states. Political subdivisions have a unique relationship with their parent states and courts should be hesitant to infer that Congress intended to intrude on internal state matters. Such subordinate government entities are created by states for their own administrative convenience. *See Trenton*, 262 U.S. at 185–86. Our inquiry must reflect this reality and protect "the substantive principle that the Constitution does not interfere with a state's internal political organization." *Rogers*, 588 F.2d at 1070. The Plaintiffs' proposed zone-of-interests test is not tailored to the particular concerns involved in cases where political subdivisions sue their parent states. As described above, that test is "not meant to be especially demanding" and "the benefit of any doubt goes to the plaintiff." *Patchak*, 567 U.S. at 225. Adopting this test for claims, such as the ones at issue here, could allow political subdivisions to interfere with the internal organization of their parent states even if Congress never intended such an outcome.

23

When addressing such sensitive areas of federalism in other contexts, the Supreme Court has refrained from intruding upon states' powers apart from clear congressional language. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989) ("Congress should make its intention clear and manifest if it intends to pre-empt the historic powers of the States[.]") (internal quotation marks omitted); *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) ("This plain statement rule is nothing more than an acknowledgment that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere."); *United States v. Bass*, 404 U.S. 336, 349 ("In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision."). And the Supreme Court has imposed this same type of plain statement rule when it appears federal action would disrupt the relationship between a state and its municipal subdivisions. *See Nixon v. Mo. Municipal League*, 541 U.S. 125, 140 (2004) (explaining "that federal legislation threatening to trench on the States' arrangements for conducting their own governments should be treated with great skepticism, and read in a way that preserves a State's chosen disposition of its own power, in the absence of [a] plain statement").

The two-step process from *Hugo* we now adopt addresses these concerns and is in line with this Supreme Court precedent. By requiring that a statute be directed at protecting subdivisions at step two, we ensure Congress has specifically weighed the

24

federalism implications of a given statute and determined political subdivisions have a particular interest in enforcing the law.[7] *See also Hugo*, 656 F.3d at 1257 ("[C]ourts have allowed such suits only when Congress has enacted statutory law *specifically providing rights to municipalities*." (emphasis added)). It is not too much to expect Congress to speak clearly before allowing a political subdivision to challenge the internal workings of its parent state. Our articulation of this test provides a path forward for political subdivisions to sue their parent states when Congress has clearly authorized such action while also safeguarding states' internal structures.[8]

---

[7] The Plaintiffs suggest *Clinton v. New York*, 524 U.S. 417 (1998), undermines our requirement that a federal statute be directed at protecting political subdivisions to bring a suit against their parent state. In *Clinton*, the plaintiffs were able to bring a challenge based on an alleged violation of the Constitution's Presentment Clause. The Plaintiffs here point out that the *Clinton* plaintiffs could proceed with their case despite not being intended beneficiaries of that constitutional provision.

*Clinton* is distinguishable for several reasons. First, it did not deal with a suit by a political subdivision against its parent state as we face here. Second, the plaintiffs' cause of action in *Clinton* was not inferred from the Presentment Clause. The Line Item Veto Act at issue in that case explicitly created a cause of action allowing citizens to challenge the Act. It stated that "[a]ny Member of Congress or any individual adversely affected by [this law] . . . may bring an action . . . for declaratory judgment and injunctive relief on the ground that any provision of this part violates the Constitution." 2 U.S.C. § 692(a)(1). Thus, *Clinton* has no bearing on the case before us now.

[8] In adopting this two-step test from *Hugo*, we take no position on whether at the second step of the test we may look only at the text of the relevant federal statute or whether we can look to extratextual sources to discern Congress's intent. The Supreme Court itself seems to have avoided taking a clear position on this in the plain-statement context. *Compare Will*, 491 U.S. at 65 (explaining Congress must make its intent "unmistakably clear in the language of the statute"), *with id.* at 69 (looking to legislative history to determine Congress's intent).

25

# III.  Application

Having articulated the proper manner for assessing whether a political subdivision has stated a claim against its parent state, we apply it to the present case. In doing so, we conclude the Plaintiffs have failed to state a claim on which relief can be granted.

## A.  Standard of Review

The district court and the panel originally evaluated the political subdivisions' ability to sue their parent state as a jurisdictional issue pursuant to the Governor's motion to dismiss under Rule 12(b)(1).  As we have described above, we hold here that the limit on claims brought by political subdivisions has nothing to do with our jurisdiction, but rather goes to the merits of the Plaintiffs' claims.  But in analyzing the merits of the Plaintiffs' claims, our inquiry is the same as the district court's when it evaluated jurisdiction below: Who has the ability to bring a claim under the Guarantee Clause and the Enabling Act?  And, as explained above, our approach to analyzing that inquiry is the same.  In supplemental briefing for the en banc court, the Governor argued that because the political subdivision limitation goes to the merits we should

---

Nor do we need to take a position on this issue.  Here, the Plaintiffs had every opportunity to present arguments based both upon text and legislative history.  And, based on *Kaw Tribe*, they knew that legislative history could potentially be used to determine whether Congress provided political subdivisions with a cause of action against their parent state—regardless of whether the requirement is characterized as jurisdictional or addressing the merits.  *See* 952 F.3d 1195.  Yet throughout all of the Plaintiffs' briefing both before the district court, a panel of this court, and now the en banc court they have failed to present any pertinent legislative history for us to consider when interpreting the Colorado Enabling Act.

treat the motion to dismiss under Rule 12(b)(6) rather than Rule 12(b)(1). The Governor proceeded to address the merits and why the Plaintiffs have failed to state a claim. We agree. Accordingly, we now consider the Governor's motion to dismiss under the rubric of Rule 12(b)(6) for failure to state a claim, as an alternative basis to affirm.

Thus, we apply Rule 12(b)(6)'s familiar standard for assessing whether a plaintiff has stated a claim upon which relief can be granted. To overcome a motion to dismiss under Rule 12(b)(6), the plaintiff's "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). In assessing plausibility, we take all the plaintiff's well-pleaded facts as true. *Id.* But "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.*

Despite agreeing that our political subdivision test addresses the merits rather than jurisdiction, the Plaintiffs and Judge Briscoe's Dissent caution us against undertaking any assessment of the merits at this point. They insist we must allow the case to proceed further to determine *what* a Republican Form of Government is so we can appropriately determine *who* it is intended to protect.

Although this argument may have had some superficial appeal when determining whether to resolve this issue as a jurisdictional matter under Rule 12(b)(1), it is now unavailing. *See Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir.

27

1995) ("[A] court is required to convert a Rule 12(b)(1) motion to dismiss into a Rule 12(b)(6) motion or a Rule 56 summary judgment motion when resolution of the jurisdictional question is intertwined with the merits of the case."). But under Rule 12(b)(6), we consider the legal sufficiency of the Plaintiffs' claims, which necessarily entails evaluating the merits of the complaint now.[9] Merely because the Plaintiffs insist their claim may be stronger at some future point does not relieve them of the burden of satisfying Rule 12(b)(6).

Judge Briscoe's Dissent suggests that by now applying our political subdivision test on appeal we "usurp the district court and become the first court to consider this case on the merits." Dissent at 24. We do no such thing. Recall, the district court performed the correct analysis from *Hugo*—it simply did so under the wrong procedural heading. As was the case in *Morrison*, 561 U.S. at 254, nothing in the district court's analysis turned on its mistake of treating this inquiry as jurisdictional. Neither the Plaintiffs nor Judge Briscoe's Dissent have indicated how—under our two-

---

[9] The Plaintiffs contend the suit should be able to proceed because "the merits phase of this case can add [value] in determining both what a republican form of government consists of and who may claim its benefits." Resp't Suppl. Answer Br. at 9. But the Plaintiffs have given us no indication of what additional information might become available and why that information was not available to them in crafting their complaint. We see no reason to remand for further fact-finding or let the case proceed when the Plaintiffs have been given every opportunity to advance the requisite claims to establish a cause of action. They have offered only vague legal conclusions about the guarantee of a Republican Form of Government being for political subdivisions. We will not credit these. *See Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

28

step test for analyzing whether a political subdivision has a cause of action against its parent state—remanding for the Plaintiffs to further develop the record would make any difference here.  We explain below that neither the Guarantee Clause nor the Enabling Act contemplate creating a cause of action for political subdivisions.  No amount of creative pleading on remand can change this.[10]

Thus, we affirm the dismissal on the basis of Plaintiffs' failure to state a claim.

### B.  The Guarantee Clause

In the complaint, the Plaintiffs allege the Guarantee Clause protects a Republican Form of Government.  And they also allege that TABOR violates this guarantee "for all subordinate levels of government in the State."  Aplt. App., Vol. XI at 1447.  But the complaint is entirely silent about why the political subdivisions are protected by this constitutional guarantee.

As we explained in *Hugo*, political subdivisions cannot rely on a substantive provision of the Constitution to sustain a claim against their parent state.  656 F.3d at 1258 ("[T]he Supreme Court has made clear that the Constitution does not contemplate

---

[10]  In their reply brief before the panel, the Plaintiffs offered that "[i]n their case on the merits, [they] will offer extensive historical evidence of and legal proof for the proper meaning of the Guarantee Clause and 'Republican Form of Government'[.]" Aplt. Reply Br. at 25, n.15.  But Plaintiffs fail to explain why they have neglected to bring such historical information now, when they knew it could be pertinent to their ability to proceed.  *See Kaw Tribe*, 952 F.3d at 1195.  And they have given us no indication of how such historical material could help their case here.

For instance, in their Fourth Amended Complaint, the Plaintiffs directed the district court to excerpts from *The Federalist Papers* in an attempt to overcome the Constitution's plain language.  *See* Aplt. App. 1422–23 (citing *The Federalist* Nos. 10, 39, 51, 57).  But we have perused *The Federalist Papers* ourselves and are convinced Mr. Madison has provided no safe harbor for political subdivisions.

the rights of political subdivisions against their parent states[.]"). By "substantive,"
this court in *Hugo* simply meant constitutional provisions that "provide substantive
restraints on state action[.]" *Id.* at 1262. Article IV, Section 4 of the United States
Constitution states, "[t]he United States shall guarantee to every State in this Union a
Republican Form of Government." On their own reading of the Constitution, the
Plaintiffs regard the Guarantee Clause as just such a substantive provision. Resp't
Suppl. Answer Br. at 15 ("[T]he relevant constitutional requirement, the guarantee of a
Republican Form of Government, . . . *does constrain the plenary power of the state* to
manipulate the affairs of its municipal corporations." (internal quotation marks
omitted; alterations incorporated) (emphasis added)). But the Plaintiffs cannot rely on
such a provision for their cause of action. *See Ysursa*, 555 U.S. at 363 ("[A] political
subdivision . . . has no privileges or immunities under the federal constitution which it
may invoke in opposition to the will of its creator." (internal quotation marks
omitted)). Based both on precedent and the text's clear language, the Guarantee
Clause does not confer a right on political subdivisions that they can enforce against
their parent states. The Plaintiffs have said nothing to convince us otherwise.[11]

___

[11] Judge Briscoe's Dissent contends we need not even reach this argument
because the Plaintiffs have waived their constitutional claim under the Guarantee
Clause. But the Plaintiffs did not waive this claim. They clearly invoked the
Guarantee Clause in the first page of their supplemental answer brief: "Plaintiffs have
sued to enforce the guarantees of the a Republican Form of Government afforded to
them *under the Guarantee Clause* . . . and a similar provision in the Colorado
Statehood Enabling Act." Resp't Suppl. Answer Br. at 1 (emphasis added; internal
citations omitted). And they went on to invoke the Guarantee Clause repeatedly
throughout their briefing and relied on it as to authorize their suit against the state.
*See, e.g., id.* at 8 ("[T]he Guarantee Clause provide[s] for a republican form of
government that entails a structural and interdependent relationship between state
government and political subdivisions, both with the inherent authority to raise and

Our statement from *Hugo* is as true today as it was a decade ago: "The parties have not identified, and this court has not found, a single case in which the Supreme Court or a court of appeals has allowed a political subdivision to sue its parent state under a substantive provision of the Constitution." 656 F.3d at 1257; *see also Rogers*, 588 F.2d at 1069 ("[T]he entire Constitution does not interfere in a state's internal organization of its political functions." (citing *Trustees of Dartmouth College*, 17 U.S. (4 Wheat.) 518)).[12]

## C. The Enabling Act

Faced with near-certain failure on their Guarantee Clause claim, the Plaintiffs place most of their eggs in the Enabling Act basket on appeal. They insist they "have pled sufficient factual allegations in support of their claim," including (1) "that spend revenue."); *see also id.* at 12, 15. We can and must address this claim.

[12] The Plaintiffs also suggest *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), opened up a door for constitutional challenges by political subdivisions against their parent states. In *Gomillion*, the plaintiffs were Black citizens of Tuskegee, Alabama. These citizens challenged a state statute that re-drew the city's boundaries. Relying on the Fourteenth and Fifteenth Amendments, the plaintiffs alleged the state law was passed to disenfranchise Black voters. The Court allowed the case to proceed past a motion to dismiss, explaining that "[l]egislative control of municipalities, no less than other state power, lies within the scope of relevant limitations imposed by the United States Constitution"—namely, the Equal Protection Clause's guarantee against race discrimination in political districting. *Gomillion*, 364 U.S. at 344–45.

The Court's decision in *Gomillion* does not conflict with step one of our political subdivision test. Unlike the present challenge to TABOR, *Gomillion* did "not involve a suit by a municipality against its parent state." *Hugo*, 656 F.3d at 1259. The *Gomillion* Court never had to address whether a political subdivision could sue its parent state under the Constitution. Instead, "*Gomillion* stands for the commonsense, limited proposition that a state's actions vis-a-vis municipalities may impact the rights of individuals living in the communities and that those impacted individuals are not denied the protections of the Constitution merely because the municipality itself is not contemplated by the constitutional provisions at issue." *Id.*

31

TABOR undermines a republican form of government in the state," (2) "that the Colorado constitution adopted pursuant to the Enabling Act embodied an interdependent structure between the state and the political subdivisions," and (3) "that the Enabling Act recognized the existence of both counties and public school districts prior to statehood." Resp't Suppl. Answer Br. at 6.

But looking inside, that basket is not very full. To be sure, we take all of the Plaintiffs' well-pleaded facts as true at this stage. But this standard of review does not change the underlying text of the Enabling Act. And this text is of no help to the Plaintiffs. It simply states that Colorado's "constitution shall be republican in form." 18 Stat. 474, § 4. The Act does not specify for whom the protection is intended or give any indication that a republican government is a right intrinsic to being a political subdivision.

Undeterred by the statute's complete silence, the Plaintiffs make a few tenuous attempts at explaining why this guarantee in the Enabling Act protects political subdivisions. For example, they point to language in the Enabling Act that identifies common schools as the beneficiaries of a land trust. *Id.* at §§ 7, 14. But the Plaintiffs provide no indication of how these provisions of the Enabling Act create a cause of action for political subdivisions based on the Act's separate guarantee of a "constitution republican in form." *Id.* at § 4.

Recognizing that any path forward based on the actual language of the Enabling Act is blocked, the Plaintiffs attempt to overcome the Governor's motion to dismiss by charting a course around the Act's plain language. In their supplemental briefing, the

32

Plaintiffs raise a new argument: because the political subdivisions existed prior to statehood, the Enabling Act's promise of a constitution republican in form is directed at protecting them. They reason that prior to passage of the Enabling Act, the "territorial residents had the right to govern themselves through local government institutions, and these rights were preserved under the subsequent state constitution." Resp't Suppl. Answer Br. at 11. Colorado did not create the subdivisions, so the Enabling Act did not deprive the subdivisions of the republican governance they enjoyed prior to statehood. Rather, the Act recognized an entrenched political reality. The Plaintiffs contend the Enabling Act's language promising a constitution republican in form directly protects political subdivisions that pre-dated the state because they were the very institutions on which the state was formed.

This novel theory regarding why the Enabling Act provides the political subdivisions with a cause of action does not get the Plaintiffs past Rule 12(b)(6). The Plaintiffs direct us to no cases that support a cause of action under this theory—that political subdivisions that pre-existed their parent state had their rights, forms, and structures implicitly codified by statehood. Moreover, the Plaintiffs' theory assumes the conclusion: that the Enabling Act's guarantee of a constitution republican in form was intended to protect the political subdivisions because they were already a part of the state's underlying form of government. But neither Congress nor Colorado *had* to maintain these political subdivisions in their pre-statehood form. The continued existence and function of these entities post-statehood were simply a matter of

33

administrative convenience for the state.  The fact remains that Congress was silent about whether it intended to protect the political subdivisions through the Enabling Act's promise of a "constitution republican in form."  18 Stat. 474, § 4.  The Plaintiffs ask us to infer a novel cause of action based on speculative historical exigencies.  We decline to do so.

Looking at the Enabling Act's language, we conclude the Plaintiffs cannot state a claim under the Act's promise of a republican constitution.  Neither the Enabling Act's text nor structure supports the political subdivisions' arguments.  The clause promising a constitution republican in form has no clear beneficiary.  And aside from the aforementioned references to common schools in other sections of the Enabling Act, references to other subordinate political entities are nowhere to be found.  At most, the Enabling Act specifies that "the constitution and State government shall be formed *for the people* of said Territory of Colorado."  18 Stat. 474, § 5 (emphasis added).  Just because the Plaintiffs believe that they should be included in the scope of the promise of a republican government does not make it so.  As we required in *Hugo*, and restate here, the relevant statute must be "directed at protecting political subdivisions[.]"  656 F.3d at 1257.  No such direct language exists here.

*    *    *

The Plaintiffs have failed to identify any source providing them with a cause of action to challenge TABOR.  Without a constitutional or statutory provision on which

34

to hang their hat, the Plaintiffs cannot state a claim on which relief can be granted. Thus, we affirm the dismissal of the Plaintiffs' complaint under Rule 12(b)(6).

## IV. Conclusion

We **AFFIRM** the district court's dismissal of the Plaintiffs' claims. While the district court erred in evaluating the political subdivisions' claims as a jurisdictional matter under Rule 12(b)(1), we agree with the substance of its reasoning. Because the limitations on suits that political subdivisions can bring against their parent states goes to the merits, we consider the Governor's Rule 12(b)(1) motion as a Rule 12(b)(6) motion for failure to state a claim. In doing so, we find that the Constitution's Guarantee Clause does not supply the political subdivisions with a cause of action. Likewise, because the Enabling Act is not directed at protecting the political subdivisions, the Plaintiffs cannot overcome the Governor's motion to dismiss. Given that neither the Constitution nor the Enabling Act authorize suit by the political subdivisions here, we affirm the district court's order dismissing these claims without prejudice.

17-1192, *Kerr v. Polis*, **TYMKOVICH**, Chief Judge, concurring. Hartz and Eid, Circuit Judges, joining in the concurrence. Holmes, Circuit Judge, joining as to Part II only.

I agree with the majority's decision to affirm the order below and with its analysis. But I would also dismiss the political subdivision claims as nonjusticiable political questions. Further, because the majority disposition reaches the substance of the claims and thus has the effect of preventing Plaintiffs from refiling their case, I would label it a dismissal with prejudice.

**I. Plaintiffs' claims are nonjusticiable political questions.**

Though I agree that the Plaintiffs have failed to state a claim under Rule 12(b)(6), this case should be even more open and shut. The Plaintiffs' claims based on the Guarantee Clause and the Enabling Act are nonjusticiable political questions beyond the purview of this court and should have been dismissed at the outset. Supreme Court precedent requires this conclusion. *Pacific States Telephone & Telegraph Co. v. Oregon*, 223 U.S. 118 (1912), precludes a merits review of the Plaintiffs' Guarantee Clause claim, and *Baker v. Carr*, 369 U.S. 186 (1962), precludes review of their Enabling Act claim.

Despite clear precedent to the contrary, an earlier panel of this court deemed the Plaintiffs' claims to be justiciable. *See Kerr v. Hickenlooper* (*Kerr I*), 744 F.3d 1156 (10th Cir. 2014), *vacated on other grounds*, 576 U.S. 1079 (2015). But in doing so, the panel misread *Pacific States* and misapplied *Baker*. Now that we are considering the adequacy of the Plaintiffs' claims en banc, the *Kerr I* panel's holding regarding justiciability is ripe for reexamination. "Because the question of justiciability implicates this court's jurisdiction, even if neither party, nor the district court, raised

the issue, it is our duty to undertake an independent examination to determine whether the dispute, as framed by the parties, presents a justiciable controversy." *Morgan v. McCotter*, 365 F.3d 882, 887 (10th Cir. 2004).

### A. Claims Brought Under the Guarantee Clause are Nonjusticiable

Federal courts lack jurisdiction to hear cases that involve a political question. A case involves a political question "where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'" *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012) (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993)). Courts lack jurisdiction to consider claims premised on such political questions. *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2494 (2019). The case before us requires us to answer whether the promise of a Republican Form of Government in the Guarantee Clause is such a political question.

In answering this question, we are not writing on a clean slate.

First, in *Luther v. Borden*, 48 U.S. (7 How.) 1, 42 (1849), the Supreme Court made clear that the Guarantee Clause falls within Congress's purview, not the judiciary's. The *Luther* Court explained that

> under [the Guarantee Clause] *it rests with Congress to decide what government is the established one in a State.* For as the United States guarantees to each State a republican government, Congress must necessarily decide what government is established in the State before it can determine whether it is republican or not. And when the senators and representatives of a State are admitted into the councils of the Union, the authority of the government

2

>under which they are appointed, as well as its republican character, is recognized by the proper constitutional authority. *And its decision is binding on every other department of the government, and could not be questioned in a judicial tribunal.*

48 U.S. (7 How.) at 42 (emphasis added).

Decades later, the Supreme Court again came to the same conclusion—claims brought under the Guarantee Clause are nonjusticiable political questions. *Pacific States*, 223 U.S. at 150–51. In *Pacific States*, the Supreme Court considered a taxpayer's challenge to an Oregon tax law on the ground that it was adopted by ballot initiative in violation of the Guarantee Clause. Relying on *Luther*, the Court concluded that challenges based on the Guarantee Clause present nonjusticiable political questions. In doing so, the Court declined to define the term Republican Form of Government, instead concluding that definition was of a political character and, hence, beyond the jurisdiction of the courts. *Id.* at 133 ("[T]hat question has long since been determined by this court conformably to the practise of the Government from the beginning to be political in character, and therefore not cognizable by the judicial power, but solely committed by the Constitution to the judgment of Congress."); *see also* Ryan C. Williams, *The "Guarantee" Clause*, 132 Harv. L. Rev. 602, 688 (2018) ("The modern understanding of the political question doctrine as a barrier to all Guarantee Clause claims began to crystallize with the Court's 1912 decision in *Pacific States*."). *Pacific States* binds us here.

3

Despite the Supreme Court's clear rejection of claims brought under the Guarantee Clause in *Pacific States*, the *Kerr I* panel concluded the case did not dictate the outcome for the Plaintiffs' challenge of TABOR.  The panel distinguished the Plaintiffs' case from *Pacific States*.  According to the panel, the plaintiffs in *Pacific States* presented a "much broader legal challenge" because the case involved a "wholesale attack[] on the validity of a state's government rather than, as before us [in *Kerr I*], a challenge to a single provision of a state constitution."  *Kerr I*, 744 F.3d at 1173.  Because the Plaintiffs claim that TABOR—not the entire structure of Colorado's state government—violates the Guarantee Clause, the panel concluded *Pacific States* did not control.

But this is a misreading of *Pacific States*.  The challenge in that case was to a plebiscite tax—or, read most broadly, to a 1902 amendment to the Oregon Constitution allowing for popular ballot initiatives and referenda, such as the plebiscite tax.  Chief Justice Edward White, writing for the majority, proclaimed that the taxpayer's position was, in essence, a claim that adoption of the initiative and referendum "caus[ed] the State to cease to be a government republican in form" and "destroyed all government republican in form in Oregon."  *Pacific States*, 223 U.S. 118, 140–41; *see also* Hans A. Linde, *Who is Responsible for Republican Government?*, 65 U. Colo. L. Rev. 709, 714 (1994) (Chief Justice White "assumed that a state either was republican as a whole, or it would be no proper state at all, and all its acts would be illegal . . . . White's opinion seemed blind to the obvious idea that when a state adopts one nonrepublican feature, this feature alone might be invalid.").

4

In *Pacific States*, "all the petitioners asked the Court to determine was whether the constitutional initiative was sufficiently republican." George Theodore Phillips, *Thwarting Thrasymachus: A New Constitutional Paradigm for Direct Democracy & Protecting Minority Rights*, 106 Geo. L.J. 1161, 1177 (2018). This is no broader than the legal challenge raised here. Under the logic of *Pacific States*, the Plaintiffs' claim that TABOR is inconsistent with the Guarantee Clause equates to a claim that TABOR renders the Colorado government non-republican in form. And under *Pacific States*, that claim presents a political question, not within the reach of the judicial power. *See* 223 U.S. at 150 (The "essentially political nature [of this case] is at once made manifest by understanding that the assault which the contention here advanced makes is not on the tax as a tax, but on the state as a state.").

In the wake of *Pacific States*, the Supreme Court has uniformly dismissed Guarantee Clause claims as nonjusticiable. The same term *Pacific States* was decided, the Court considered a Guarantee Clause challenge to two other amendments to the Oregon Constitution that "authorized municipalities to . . . carry[] into effect the initiative and referendum powers reserved by the amendment" at issue in *Pacific States*. *See Kiernan v. City of Portland*, 223 U.S. 151, 160 (1912). The Court concluded these amendments, too, were nonjusticiable under the Guarantee Clause. *Id.* at 164. A year later, the Court heard a Guarantee Clause challenge to Indiana's constitutional amendment procedure, which allowed constitutional changes to be approved by ballot initiative. *Marshall v. Dye*, 231 U.S. 250, 255 (1913). Relying on

5

*Pacific States*, the Court dismissed the case because it "present[ed] no justiciable controversy[.]" *Id.* at 256–57.

By 1915, the notion that the Guarantee Clause was nonjusticiable was so clearly established that the Court summarily dismissed such claims: "The attempt to invoke [the Guarantee Clause] . . . is obviously futile[.]" *O'Neill v. Leamer*, 239 U.S. 244, 248 (1915) (citing *Pacific States*, 223 U.S. 118). In 1916, the Court considered another plebiscite challenge—there, to an amendment to the Ohio constitution—after a state reapportionment statute had been invalidated by ballot referendum. *State of Ohio ex rel. Davis v. Hildebrandt*, 241 U.S. 565, 566 (1916). Unsurprisingly, the Court concluded that the argument there "disregard[ed] the settled rule that the question of whether the [Guarantee Clause] of the Constitution has been disregarded presents no justiciable controversy, but involves the exercise by Congress of the authority vested in it by the Constitution." *Id.* at 569 (citing *Pacific States*, 223 U.S. 118).[1]

---

[1]  This practice has continued to the present day; indeed, since 1912, the Court has never found a Guarantee Clause claim to be justiciable. *See, e.g.*, *Mountain Timber Co. v. State of Washington*, 243 U.S. 219, 234 (1917) ("It is urged that the law violates § 4 of Article IV of the Constitution of the United States, guaranteeing to every State in the Union a republican form of government. As has been decided repeatedly, the question whether this [guarantee] has been violated is not a judicial but a political question, committed to Congress, and not to the courts."); *Highland Farms Dairy v. Agnew*, 300 U.S. 608, 612 (1937) ("[E]nforcement of that guarantee, according to the settled doctrine is for Congress, not the courts."); *Colegrove v. Green*, 328 U.S. 549, 556 (1946) ("Violation of the great guaranty of a republican form of government in States cannot be challenged in the courts."); *City of Rome v. United States*, 446 U.S. 156, 182 (1980) ("We do not reach the merits of the appellants' argument that the Act violates the Guarantee Clause, Art. IV, § 4, since that issue is not justiciable."); *Rogers v. Lodge*, 458 U.S. 613, 634 (1982) ("Violation of the great guaranty of a republican form of government in States cannot be challenged in the courts. The Constitution has left the performance of many duties in our governmental scheme to depend on the fidelity of the executive and legislative action and, ultimately, on the vigilance of the people in exercising their political

Despite this longstanding practice of treating Guarantee Clause claims as nonjusticiable, the Supreme Court later indicated in *New York v. United States*, 505 U.S. 144, 185 (1992), that "perhaps not all claims under the Guarantee Clause present nonjusticiable political questions." Still, the Court in *New York* declined to resolve the "difficult question" of what claims *might* be justiciable under the Guarantee Clause. *Id.* It dodged the issue, concluding that, "even indulging the assumption that the Guarantee Clause provides a basis upon which a State or its subdivisions may sue to enjoin the enforcement of a federal statute, petitioners have not made out such a claim in these cases." *Id.* at 186.[2]

---

rights.").

[2] Following the Court's decision in *New York*, other circuit courts have disposed of Guarantee Clause claims on both non-justiciability grounds and, sometimes, on the merits after assuming justiciability. *See, e.g.*, *Deer Park Indep. School Dist. v. Harris Cnty. Appraisal Dist.*, 132 F.3d 1095, 1099 (5th Cir. 1998) ("This [Guarantee Clause] claim is not only incorrect, it is absurd. . . . [T]he Supreme Court has held that challenges to Congressional action under the Guarantee Clause are not justiciable."); *Travis v. Reno*, 163 F.3d 1000, 1007 (7th Cir. 1998) ("Even if we were to put to one side the Supreme Court's holding that claims under the guarantee clause are not justiciable when raised by private persons and perhaps even when raised by states, we would see little merit to the contention." (internal citations omitted)); *Murtishaw v. Woodford*, 255 F.3d 926, 961 (9th Cir. 2001) ("A challenge based on the Guarantee Clause, however, is a nonjusticiable political question."); *Largess v. Supreme Jud. Ct. for State of Mass.*, 373 F.3d 219, 226 (1st Cir. 2004) ("Whether or not the plaintiffs can satisfy their self-tailored [justiciability] test, they simply have no viable Guarantee Clause claim on these facts."); *U.S. ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc., v. Westchester Cnty.*, 712 F.3d 761, 774 (2d Cir. 2013) (denying Guarantee Clause claim on the merits and explaining that "[a]s this and other courts have repeatedly noted, such determinations are nonjusticiable political questions"); *Phillips v. Snyder*, 836 F.3d 707, 717 (6th Cir. 2016) ("Even assuming that a challenge based on the Guarantee Clause may be justiciable in some circumstances, we are aware of no case invalidating the structure of political subdivisions of states under the Clause."); *Kerpen v. Metro. Wash. Airports Auth.*, 907 F.3d 152, 163 (4th Cir. 2018) ("[E]ven assuming appellants' Guarantee Clause claim is justiciable, it fails on the merits."); *but see Democratic Party of Wis. v. Vos*, 966

7

But since the Court's equivocation in *New York*, it has reaffirmed its holding in *Pacific States* on several occasions. For example, in *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 576 U.S. 787 (2015), the Court stated: "The people's sovereign right to incorporate themselves into a State's lawmaking apparatus, by reserving for themselves the power to adopt laws and to veto measures passed by elected representatives, is one this Court has ranked a nonjusticiable political matter." 576 U.S. 787, 795 n.3 (citing *Pacific States*, 223 U.S. 118).[3] Then in *Rucho*, decided in 2019, the Supreme Court again appeared to reaffirm the categorical rule that Guarantee Clause claims are nonjusticiable. 139 S. Ct. at 2506. The Court remarked that the district court's objection below "seems . . . more properly grounded in the Guarantee Clause of Article IV, § 4, which guarantees to every State in the Union a Republican Form of Government. This Court has several times concluded, however, that the Guarantee Clause does not provide the basis for a justiciable claim." *Id.* (citing *Pacific States*, 223 U.S. 118) (internal quotation marks omitted; alterations incorporated). The Court did not acknowledge any exceptions to this rule.

Despite such categorical language throughout Supreme Court case law, the *Kerr I* panel treated the Court's dicta in *New York* as an invitation to do what the Court would not: decide what types of Guarantee Clause claims are justiciable. *See* 744 F.3d

---

F.3d 581, 589 (7th Cir. 2020) ("The district court thus went too far in saying that no Guarantee Clause claim could proceed to adjudication on the merits. Instead, it should have decided simply whether this particular Guarantee Clause claim is among the rare ones that can survive a motion to dismiss. We conclude that it is not.").

[3] Admittedly, the Court followed its reference to *Pacific States* with a "but see" signal to *New York*. But until the Court actually overrules *Pacific States*, it remains binding law.

at 1179. In doing so, the *Kerr I* panel interpreted *Baker v. Carr*, 369 U.S. 186 (1962), as rejecting the categorical rule that all Guarantee Clause claims are nonjusticiable. *See Kerr I*, 744 F.3d at 1174. But in *Baker* the Court actually reaffirmed the idea that Guarantee Clause claims are per se nonjusticiable: "The Court has consistently held that a challenge to state action based on the Guaranty Clause presents no justiciable question[.]" 369 U.S. at 224. Thus, the Court made quite clear it was not relying on the Guarantee Clause. *Id.* at 209 ("We hold that the claim pleaded here neither rests upon nor implicates the Guaranty Clause and that its justiciability is therefore not foreclosed by our decisions of cases involving that clause."); *id.* at 227 ("[T]he appellants might conceivably have added a claim under the Guaranty Clause. Of course, as we have seen, any reliance on that clause would be futile."). Nowhere in *Baker* does the Supreme Court retreat from previous cases holding that Guarantee Clause cases are nonjusticiable.

### B. Claims Seeking to Enforce a Republican Form of Government Lack a Judicially Manageable Standard

Even if the Supreme Court in *Baker* departed from its previous holdings that categorically barred Guarantee Clause claims, the Plaintiffs' claims here are still nonjusticiable.

In *Baker*, the Court walked through the reasoning of its prior Guarantee Clause cases to derive the six factors that make up the test for justiciability. *Id.* at 211 (analyzing "representative cases and . . . infer[ring] from them the analytical threads that make up the political question doctrine"). These factors include (1) a textually demonstrable constitutional commitment of the issue to a coordinate political

9

department; (2) a lack of judicially discoverable and manageable standards for resolving it; (3) whether the claim requires the court to make an initial policy determination of a kind clearly for nonjudicial discretion; (4) whether the claim can be resolved without expressing a lack of the respect due coordinate branches of government; (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment from multifarious pronouncement by various departments on one question. *Id.* at 217.[4]

The *Kerr I* panel concluded that none of the six *Baker* factors were implicated by the Plaintiffs' Guarantee Clause claim. 744 F.3d at 1176–82. I disagree. Though I think any of factors one through five could be implicated in this case, I will focus on the most obvious—factor two: the lack of judicially manageable standards. Wholly aside from *Pacific States* and its progeny, the lack of any judicially manageable standard for resolving this case dooms not only the Plaintiffs' constitutional claim, but also their statutory claim.

The *Kerr I* panel did not expressly find any "judicially manageable standards," but assured the readers that "[o]ur review of the record and briefing in this case satisfies us that judicially discoverable and manageable standards for Guarantee Clause litigation exist." *Id.* at 1179. But if these standards exist, why are the Plaintiffs

---

[4] It is worth noting that the *Baker* Court determined factor two was implicated in *Luther*'s holding "that the Guaranty Clause is not a repository of judicially manageable standards which a court could utilize independently in order to identify a State's lawful government." 369 U.S. at 223. Such a statement reaffirms that the Supreme Court in *Baker* never questioned its longstanding holding that Guarantee Clause claims are not justiciable.

10

hiding the ball and why didn't *Kerr I* show us the way?  As far as I can tell, in the decade since the Plaintiffs filed this case, they have not suggested an appropriate standard that could guide federal courts.  During oral argument, the Plaintiffs acknowledged that some form of direct democracy is acceptable, *see* Oral Argument at 19:00–25, but they have not told us how much, or how courts ought to assess whether the "too much" line has been crossed.

Scholars have tried to fill in these conceptual gaps.  For instance, some have suggested the touchstone of the Guarantee Clause is "popular sovereignty."  *See, e.g.*, Jarret Zafran, *Referees of Republicanism: How the Guarantee Clause Can Address State Political Lockup*, 91 N.Y.U. L. Rev. 1418, 1446–47 (2016) ("[J]udicially manageable standards can be derived from the conception of the Clause focused on popular sovereignty, meaning that guarantee claims are justiciable per the *Baker* criteria.").  Under such an interpretation, the Clause includes an "implied guarantee of fair and open elections and a prohibition on structures that entrench the status quo and limit popular control."  *Id.*  And others have proposed that laws passed by direct democracy which did not involve "deliberation by representatives" violate the Guarantee Clause because it promises a *Republican* Form of Government.  Hans Linde, *Who is Responsible for Republican Government?*, 65 U. Colo. L. Rev. 709, 722–24 (1994).[5]

---

[5] Even if a judicially manageable standard can be discerned from scholarship on the Guarantee Clause, none of this scholarship supports the Plaintiffs' position. *See Kerr v. Hickenlooper*, 759 F.3d 1186, 1195 & n.2 (10th Cir. 2014) (Gorsuch, J., dissenting from denial of rehearing en banc) ("[M]uch of [the scholarship] suggests that the Clause may rule out a state monarchy, a smaller amount . . . suggests the

11

But such attempts to read judicially manageable standards into the Guarantee Clause fail. While a focus on "popular sovereignty" may sound more familiar than a guarantee of a Republican Form of Government, shifting vocabulary does not mean the Guarantee Clause suddenly has a judicially manageable standard. It just kicks the can down the road. Decisions about whether a state's practices for electing representatives are sufficiently "popular" are inherently political decisions. *Accord Rucho*, 139 S. Ct. at 2499 ("Unable to claim that the Constitution requires proportional representation outright, plaintiffs inevitably ask the courts to make their own political judgment about how much representation particular political parties deserve . . . . But federal courts are not equipped to apportion political power as a matter of fairness[.]"); *see also* Francesca Procaccini, *Reconstructing State Republics*, 89 Fordham L. Rev. 2157, 2227 (2021) ("[T]here is no principled interpretive methodology for determining the contemporary meaning and requirements of republican government that is divorced from baseline political assumptions."). And it can't be the case that the judicially manageable standard is whether a state law is the product of deliberation among representatives. The Guarantee Clause provides no indication of how much or what

---

Clause may rule out a complete direct democracy, but none . . . credibly suggests a limited dose of direct democracy of the sort at issue here is constitutionally problematic." (citing Robert Natelson, *A Republic, Not a Democracy? Initiative, Referendum, and the Constitution's Guarantee Clause*, 80 Tex. L. Rev. 807, 811 n.19 (2002)); G. Edward White, *Reading the Guarantee Clause*, 65 U. Colo. L. Rev. 787, 803–06 (1994); Akhil Reed Amar, *The Central Meaning of Republican Government: Popular Sovereignty, Majority Rule, and the Denominator Problem*, 65 U. Colo. L. Rev. 749, 749–52, 761–73 (1994); Jonathan Toren, *Protecting Republican Government from Itself: The Guarantee Clause of Article IV, Section 4*, 2 N.Y.U. J.L. & Liberty 371, 374–92, 392–99 (2007))).

12

form of deliberation would be required by state representatives to ensure a given initiative or referendum does not run afoul of the Constitution. Moreover, the Supreme Court has approved of various exercises of direct democracy on numerous occasions. *See, e.g.*, *Ariz. State Legislature*, 576 U.S. at 823–24 (allowing a ballot initiative that created a redistricting commission); *Pacific States*, 223 U.S. 149–51 (upholding a ballot initiative taxing certain classes of corporations).

Without any judicially manageable standard to offer, the Plaintiffs have at various points in litigation attempted to distinguish taxation as a core legislative function. Thus, according to the Plaintiffs, representative government cannot exist without the power to tax. Again, the Plaintiffs have not indicated how much the citizenry can supervise the state legislature's taxing and spending power. The Plaintiffs seem to believe the federal courts can infer with Goldilocks-precision how much interference is "too much" and "just right." And, even assuming a grain of truth in the Plaintiffs' argument that taxing is a core legislative power (bearing in mind that the United States had no national income tax until 1913), assigning a role to the electorate in raising taxes and setting tax policy hardly changes a republican government into something akin to a monarchy.[6]

One would think a case in its second decade would have more. After all, Colorado has been stuck in federal court under two governors, wasting litigation

---

[6] Colorado voters have approved numerous state and local tax measures involving taxing and spending since 1992, so TABOR has not been an insuperable barrier to voter approval of consensus-driven proposals.

13

resources along the way.  As one of us said in an earlier review of the complaint, "Federalism and comity appear to count for little when we condemn a state, its governor, and its constitution to a multi-year scavenger hunt up and down the federal court system looking for some judicially manageable standard that might permit us to lawfully entertain the case in the first place."  *Kerr v. Hickenlooper*, 759 F.3d at 1196 (Gorsuch, J., dissenting from denial of rehearing en banc).

The Plaintiffs' struggle to articulate a manageable standard should come as no surprise.  No less a luminary than John Adams confessed he "never understood" what the Guarantee Clause meant and insisted that "no man ever did or will."  Letter from John Adams to Mercy Warren (July 20, 1807), https://founders.archives.gov/documents/Adams/99-02-02-5195.[7]

If the Plaintiffs now expect us to develop a standard of our own, they are barking up the wrong tree.  Courts do not engage in an "amorphous general supervision of the operations of government."  *Raines v. Byrd*, 521 U.S. 911, 829 (1997).  That is Congress's job.  Where, as here, "a court is given no standard by which to adjudicate a dispute[,] . . . resolution of the suit is beyond the judicial role envisioned by Article III."  *Zivotofsky*, 566 U.S. at 204 (Sotomayor, J., concurring).

Here, both the Constitution and the Enabling Act contain virtually identical guarantees to a Republican Form of Government.  The Plaintiffs have made no effort to supply us with a judicially manageable standard to determine whether TABOR

---

[7] Adams went on to opine that "[t]he word [Republican] is so loose and indefinite that successive predominant factions will put glosses and constructions upon it as different as light and darkness."  *Id.*

14

violates either the constitutional or statutory guarantees. Accordingly, I would find neither of the Plaintiffs' claims to be justiciable under *Baker*.

Whatever the status of the current law on the justiciability of Guarantee Clause claims, we know *Pacific States* remains binding law. That case squarely forecloses the Plaintiffs' claim that TABOR violates the Guarantee Clause's promise of a Republican Form of Government. And even if *Pacific States* must be reinterpreted through the lens of *Baker*, the Plaintiffs have still failed to supply us with a judicially manageable standard we can apply to challenges of state action under the Guarantee Clause. If the Plaintiffs believe the door is still open to state a justiciable claim under the Guarantee Clause, that is an issue they should raise with the Supreme Court. Until then, I would find that we lack jurisdiction to consider the Plaintiffs' claims on the merits.

## II. The decision below should be converted to a dismissal with prejudice

Although the majority affirms and remands to the district court without prejudice, I would convert the dismissal below to one with prejudice. The district court considered the merits of the case, and we affirm on the merits. Thus, conversion to a dismissal with prejudice would enforce the practical effect of this ruling: Plaintiffs are prevented from refiling this case.

Judge Bacharach's Concurrence contends that in this circuit, changing a dismissal without prejudice to a dismissal with prejudice runs afoul of the cross-appeal rule. Concurrence at 6 (citing *June v. Union Carbide Corp.*, 577 F.3d 1234, 1248 n.8 (10th Cir. 2009)). In *Union Carbide*, a panel of this court avoided the question of

15

whether an issue was jurisdictional or went to the merits because, regardless of the categorization, it concluded that the categorization could not change the nature of the dismissal. *See* 577 F.3d at 1248 n.8. The panel explained that the appellees' "failure to cross-appeal on this issue precludes us from remanding for entry of dismissal with prejudice." *Id.* According to the panel there, the cross-appeal rule "preclude[s] an appellate court, in the absence of a cross-appeal, from changing a dismissal without prejudice to a dismissal with prejudice." *Id.*

But if in *Union Carbide* our court viewed this road as blocked, the Supreme Court has since removed any barriers.

In *Morrison v. National Australia Bank Ltd.*, the Supreme Court needed to decide whether § 10(b) of the Securities Exchange Act of 1934 provided a cause of action to foreign plaintiffs for "misconduct in connection with securities traded on foreign exchanges." 561 U.S. 247 (2010), at 251. Because most of the alleged misconduct took place abroad, the district court determined § 10(b) did not cover the complained of securities fraud. The district court, following Second Circuit precedent, dismissed the complaint under Rule 12(b)(1) for lack of subject-matter jurisdiction based on the extraterritorial nature of most of the conduct.

The Supreme Court affirmed the dismissal of the plaintiff's claims, but did so under Rule 12(b)(6) rather than Rule 12(b)(1). The Court explained that the extraterritorial reach of § 10(b) was a question going not to the Court's jurisdiction, but to the merits of the case. *Id.* at 254 ("But to ask what conduct § 10(b) reaches is to

16

ask what conduct § 10(b) prohibits, which is a merits question."). Given this error, the plaintiff asked the Supreme Court to remand for the district court to reevaluate the complaint under Rule 12(b)(6). The Court concluded remand was "unnecessary." *Id.* It reasoned that "[s]ince nothing in the analysis of the courts below turned on the mistake, a remand would only require a new Rule 12(b)(6) label for the same Rule 12(b)(1) conclusion." *Id.*[8] Thus, the Court "proceed[ed] to address whether petitioners' allegations state a claim." *Id.* In doing so, the Supreme Court did not address the cross-appeal rule because it did not have to—it simply applied the correct terminology to match the substance of what the lower courts had already done.[9]

To remand when nothing turned on the district court's mistake would be an exercise in futility—the district court would simply reapply the same legal analysis

---

[8] In such instances, the appellate court is not enlarging the rights of the defendant. To enlarge the rights of the defendant, an appellate court's decision would have to change the ultimate outcome in favor of the defendant. But whether the same question is answered (improperly) under the heading of Rule 12(b)(1) or (properly) under Rule 12(b)(6), the ultimate outcome of the case remains the same: the plaintiffs cannot bring their claim.

[9] Judge Bacharach's Concurrence insists that in *Morrison* the Supreme Court did not open up any paths through the cross-appeal rule. Concurrence at 6–7. Again, it did not need to. The cross-appeal rule is implicated only when an appellate court alters a judgment to benefit the non-appealing party. *See Greenlaw*, 554 U.S. at 244. In *Morrison*, the appellees never cross-appealed. *See Morrison v. National Australia Bank Ltd.*, 547 F.3d 167 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010). Yet after properly categorizing the question as one addressing the merits, the Supreme Court determined a remand was unnecessary, instead explaining that all that would happen on remand was a switching of labels. *Morrison*, 561 U.S. at 254. The same is true here. Thus, to the extent that this court suggested in *Union Carbide* that *all* instances of converting a dismissal without prejudice to a dismissal with prejudice enlarge an appellee's rights—even when nothing turned on the district court's incorrect labeling of the dismissal—I disagree with that conclusion in light of *Morrison*.

under the correct heading and reach the same result.  Any purposes underlying the

cross-appeal rule would not be advanced by applying the rule to situations like the one

present in *Morrison*.

Consequently, the fact that dismissal under Rule 12(b)(1) is without prejudice

and we would consider the dismissal under Rule 12(b)(6) with prejudice is, in this

case, a distinction without a difference.[10]  The district court answered the correct

merits question, just under the wrong heading.  Though the district court styled its

dismissal as one without prejudice, it answered the merits question and thus dismissal

should have been with prejudice.  Accordingly, there would be nothing amiss if we

were to correct this error because our dismissal with prejudice would have no practical

effect on the district court's conclusion.  In a similar fashion, we have previously

---

[10]  "When a federal court rules that a dismissal is with prejudice, it is saying only that the claim cannot be refiled in that court." *Styskal v. Weld Cnty. Bd. of Cnty. Com'rs*, 365 F.3d 855, 859 (10th Cir. 2004) (internal quotation marks omitted; alterations incorporated).  Here, that was the practical effect of the district court's order.  Neither the text of the Constitution or the Colorado Enabling Act will change.  Thus, the plaintiffs have no cause of action to pursue these claims against their parent state.  In concluding that the plaintiffs lacked political subdivision standing, the district court was making a merits determination: these plaintiffs cannot bring this claim in the district court again.  In now labeling the present dismissal as "with prejudice" we would do no more than correctly label the dismissal based on its actual effect.  The fact that the district court improperly labeled the dismissal in the first instance based on our previous precedent is of no moment.

The Supreme Court has also made clear that an "adjudication on the merits is the opposite of a dismissal without prejudice[.]" *Semtek Intern. Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 505 (2001) (internal quotation marks omitted).  Given that Judge Bacharach's Concurrence agrees that we are adjudicating based on the substance of the claim, rather than on procedural or jurisdictional grounds, it is unclear how it also believes the dismissal can also be without prejudice. *See id.* ("With prejudice is an acceptable form of shorthand for an adjudication upon the merits." (internal quotation marks omitted)).

18

"[e]xercis[ed] our plenary power [to] treat the government's [Rule 12(b)(1)] motion as a motion for summary judgment." *Redmon ex rel. Redmon v. United States*, 934 F.2d 1151, 1155 (10th Cir. 1991). And the Seventh Circuit, which applies a narrow rule, has regularly modified dismissals for lack of jurisdiction to dismissals on the merits—in other words, modification from dismissal without prejudice to dismissal with prejudice. *See, e.g.*, *Matushkina*, 877 F.3d at 297; *Morfin v. Tillerson*, 851 F.3d 710, 714 (7th Cir. 2017); *Hazama v. Tillerson*, 851 F.3d 706, 710 (7th Cir. 2017). As we would merely be correcting a "threshold" mistake in the district court's analysis, I would hold that the cross-appeal rule does not apply in this case, and allowing Plaintiffs to refile to ask the exact same question is unnecessary. *Morrison*, 561 U.S. at 253. Thus, I would both affirm the dismissal below and convert it to a dismissal with prejudice.

## Conclusion

Because I consider the Guarantee Clause question to be nonjusticiable, I would not reach the merits of this case. But the opinion of this court does decide the merits, and the district court did as well. Thus, this court should give the order the true effect of a dismissal on the merits. The case should be dismissed with prejudice.

*Kerr v. Polis*, No. 17-1192
**BACHARACH**, J., concurring, joined by **McHUGH**, J. and **MORITZ**, J.,
Circuit Judges.

I agree with the majority that

- the district court erred in deciding that the political subdivisions lack standing,

- we can consider whether to affirm the dismissal based on the failure to state a valid claim, and

- the political subdivisions have not stated a valid claim.

But I respectfully disagree with the disposition that Chief Judge

Tymkovich proposes in his concurrence.[1] There he says that he would

convert the dismissal from one without prejudice into one with prejudice

even though the Governor did not cross-appeal.

As Chief Judge Tymkovich states, the cross-appeal rule applies

"when an appellate court alters a judgment to benefit the non-appealing

party." Chief Judge Tymkovich's Concurrence at 17 n.9 (citing *Greenlaw*

*v. United States,* 554 U.S. 237, 244 (2008)).[2] Despite this rule, Chief Judge

---

[1]     In writing for the majority, Chief Judge Tymkovich affirms the dismissal without prejudice. In his concurrence, however, he states that he would change the disposition to a dismissal with prejudice.

[2]     As Judge Briscoe observes, this benefit may come from either

- enlarging the benefit to the appellee or

- lessening the rights of the appellant.

Judge Briscoe's Partial Concurrence & Partial Dissent at 22 (citing *Jennings v. Stephens*, 574 U.S. 271, 276 (2015)).

Tymkovich would alter the judgment without a cross-appeal. The majority

instead affirms, leaving the disposition unaltered. This disposition is

necessary because the cross-appeal rule prevents alteration of the dismissal

without prejudice into a dismissal with prejudice.[3]

The district court ordered dismissal for lack of jurisdiction, which

would ordinarily be without prejudice. Maj. Op. at 9; *see Brown v.*

*Buhman*, 822 F.3d 1151, 1179 (10th Cir. 2016). If we were to uphold the

dismissal and change it to a dismissal with prejudice, we'd enlarge the

judgment for the Governor. We can't enlarge the judgment for the

Governor because he did not cross-appeal. *See June v. Union Carbide*

*Corp.*, 577 F.3d 1234, 1248 n.8 (10th Cir. 2009) (denying the appellee's

request to change a dismissal without prejudice to a dismissal with

prejudice absent a cross-appeal); *accord Conover v. Lein*, 87 F.3d 905, 908

(7th Cir. 1996) (concluding that the Court of Appeals lacked "jurisdiction

to modify" the dismissal from one without prejudice to one with prejudice

because the appellee had not cross-appealed).

Chief Judge Tymkovich contends that he wouldn't be enlarging the

judgment because the pleading defect couldn't be cured even though the

district court's dismissal had been without prejudice. Chief Judge

---

[3]      A majority of the en banc court agrees. *See* Judge Briscoe's Partial
Concurrence & Partial Dissent at 18–22.

Tymkovich's Concurrence at 17–19 & nn.9–10. This contention errs factually and legally.

In my view, Chief Judge Tymkovich errs factually by assuming that the political subdivisions couldn't possibly remedy the pleading defect even if the dismissal remained without prejudice. *Id.* at 18 n.10. For this contention, Chief Judge Tymkovich states that "[n]either the text of the Constitution or the Colorado Enabling Act will change." *Id.* But the political subdivisions could present legislative history if they refile because the majority takes no position on the availability of "extratextual sources to discern Congress's intent." Maj. Op. at 25 n.8.

Chief Judge Tymkovich states that the political subdivisions have already had a chance to present extratextual interpretive aids like legislative history. For the sake of argument, let's credit this statement. But the dismissal without prejudice allows the political subdivisions to file a new action and present the district court with new evidence of legislative history.

The district court could then exercise its discretion to consider the newly submitted evidence of legislative history or decide that the submission is too late. Chief Judge Tymkovich would take this opportunity away from the political subdivisions by preventing them from even trying to present the district court with new evidence of legislative history. His proposed change in disposition would thus stymie the political

3

subdivisions, barring them from refiling the suit and presenting new evidence of legislative history.[4]

Chief Judge Tymkovich's approach also fails legally by relying on a Seventh Circuit opinion: *Matushkina v. Nielsen*, 877 F.3d 289, 296–97 (7th Cir. 2017). Chief Judge Tymkovich's Concurrence at 19. Irrespective of the Seventh Circuit's approach, we treat the cross-appeal rule as jurisdictional. *See Johnson v. Spencer*, 950 F.3d 680, 722–23 (10th Cir. 2020) (concluding that we "lack jurisdiction" to "afford . . . any relief" to the appellees because they did not file a cross-appeal); *Weber v. GE Grp. Life Assur. Co.*, 541 F.3d 1002, 1008 (10th Cir. 2008) (stating that we lack jurisdiction to enlarge the rights of the appellee absent a cross-appeal).[5]

---

[4]    Judge Briscoe concludes that "the majority opinion creates an all but insurmountable burden to [the political subdivisions'] prevailing on the merits." Judge Briscoe's Partial Concurrence & Partial Dissent at 23. For this conclusion, Judge Briscoe points to Chief Judge Tymkovich's concurrence, which views the dismissal without prejudice as the practical equivalent of a dismissal with prejudice. *Id.* There, however, Chief Judge Tymkovich reasoned that the text of the Constitution and Rules Enabling Act won't change. Chief Judge Tymkovich's Concurrence at 18 n.10.

Judge Briscoe elsewhere acknowledges that the political subdivisions can refile and submit legislative history showing congressional intent to protect political subdivisions. Judge Briscoe's Partial Concurrence & Partial Dissent at 23 n.10. Given this opportunity to cure the defect, the dismissal without prejudice does *not* create an "insurmountable burden to [the political subdivisions'] prevailing on the merits." *Id.* at 23.

[5]    The political subdivisions did not question our jurisdiction to affirm under Rule 12(b)(6). But we must ensure our own jurisdiction. *See, e.g.*, *Amazon, Inc. v. Dirt Camp, Inc.*, 273 F.3d 1271, 1274 (10th Cir. 2001)

4

Given the jurisdictional nature of our rule, we have strictly required a cross-appeal, resisting the temptation to change the dismissal from one "without prejudice" to one "with prejudice"—even when the change wouldn't make any practical difference.

An example appears in *June v. Union Carbide Corp.*, 577 F.3d 1234 (10th Cir. 2009). There Colorado residents sued under the Price-Anderson Act, claiming that the defendants had failed to provide medical monitoring after exposing individuals to radiation. *Id.* at 1236. The district court ordered dismissal without prejudice for lack of subject-matter jurisdiction based on the plaintiffs' failure to allege bodily injury. *Id.* at 1238.

On appeal, the defendants argued that

- a bodily injury constituted an element of the claim rather than a jurisdictional requirement and, as a result,

- the dismissal should have been with prejudice (rather than without prejudice).

*Id.* at 1248 n.8. Changing the dismissal from one without prejudice to one with prejudice would not have made a practical difference because the failure to allege a bodily injury would have torpedoed the claim either way. *See id.* ("[O]ur standard of appellate review of the bodily-injury issue would be the same in this case whether we treat the issue as a matter of jurisdiction or of the sufficiency of the evidence on summary judgment.").

---

("Although neither party challenges our appellate jurisdiction, we have an independent duty to examine our own jurisdiction.").

5

But the lack of a practical difference didn't matter because the failure to file a cross-appeal categorically prohibited us from changing the dismissal into one with prejudice: "This rule [the cross-appeal rule] applies to preclude an appellate court, in the absence of a cross-appeal, from changing a dismissal without prejudice to a dismissal with prejudice." *Id.* (quoting *Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 560 F.3d 118, 126 (2d Cir. 2009)).

As an en banc court, we have the power to overrule any of our panel opinions. Chief Judge Tymkovich would wield this power here, "disagree[ing]" with *June* to the extent that it impedes conversion to a dismissal with prejudice. *Id.* at 17 n.9. In other words, *June* would apply except when it wouldn't. By sua sponte converting the dismissal to one with prejudice, Chief Judge Tymkovich would

- confuse our jurisdictional cross-appeal rule for future panels and practitioners and

- modify the rule without briefing from the parties.

Defending this approach, Chief Judge Tymkovich suggests that the Supreme Court has recognized jurisdiction to decide the merits when a district court has dismissed the case for lack of jurisdiction. For this suggestion, Chief Judge Tymkovich relies primarily on *Morrison v. National Austl. Bank Ltd.*, 561 U.S. 247 (2010). Chief Judge Tymkovich's Concurrence at 16–18 & n.9. But the Supreme Court in *Morrison* never

6

even mentioned the cross-appeal rule (or, for that matter, even said whether a cross-appeal had been filed).[6] We can't interpret *Morrison* to recognize jurisdiction when it wasn't even discussed. *See Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144–45 (2011) ("When a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed."); *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) ("Even as to our own judicial power or jurisdiction, this Court has followed the lead of Chief Justice Marshall who held that this Court is not bound by a prior exercise of jurisdiction in a case where it was not questioned and it was passed sub silentio."); *see also Cope v. Kan. State Bd. of Educ.*, 821 F.3d 1215, 1221 n.5 (10th Cir. 2016) ("*Edwards* and other cases [the plaintiff] relies on do not discuss standing, and so do not stand for the proposition that a standing defect did not exist on the facts of those cases.").

Chief Judge Tymkovich also points to a Tenth Circuit opinion and two Seventh Circuit opinions: *Redmon ex rel. Redmon v. United States*, 934 F.2d 1151 (10th Cir. 1991), *Morfin v. Tillerson*, 851 F.3d 710 (7th Cir.

---

[6]    Chief Judge Tymkovich states that there was no cross-appeal in *Morrison*, citing the Second Circuit's opinion. Chief Judge Tymkovich's Concurrence at 17 n.9. But the Second Circuit's opinion never said whether a cross-appeal had been filed. *See generally Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010).

7

2017), and *Hazama v. Tillerson,* 851 F.3d 706 (7th Cir. 2017). Chief Judge Tymkovich's Concurrence at 19. But none of these opinions discuss the cross-appeal rule or even say whether the appellees had cross-appealed.

With no cross-appeal, we lack jurisdiction to enlarge the judgment for the Governor by changing the dismissal without prejudice to a dismissal with prejudice. But there's no need to change the disposition: the Court has properly affirmed the dismissal as one without prejudice. *See Orr v. Clements*, 688 F.3d 463, 465 (8th Cir. 2012) (stating that a dismissal under Rule 12(b)(6) "can be rendered without prejudice if the court so specifies"); *see also Carter v. Norfolk Cmty. Hosp. Assoc.*, 761 F.2d 970, 974 (4th Cir. 1985) ("A district court's dismissal under Rule 12(b)(6) is, of course, with prejudice unless it specifically orders dismissal without prejudice. That determination is within the district court's discretion.").

Judge Briscoe questions the authority of a court to dismiss an action without prejudice under Rule 12(b)(6). Judge Briscoe's Partial Concurrence & Partial Dissent at 17–18 n.8. But this authority comes from Rule 41(b) of the Federal Rules of Civil Procedure. This rule does two things:

1.    It allows the court to dismiss an action or claim for failure to comply with the rules or an order.

2.    It addresses the effect of various dismissals.

8

The first part of the rule doesn't apply, but the second part does. It states: "*Unless the dismissal order states otherwise*, a dismissal under this subdivision (b) and *any dismissal not under this rule*—except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19—operates as an adjudication on the merits." Fed. R. Civ. P. 41(b) (emphasis added). By its terms, the second part of the rule addresses the effect of various *other* dismissals, including those for failure to state a valid claim under Rule 12(b)(6). *See Paganis v. Blonstein*, 3 F.3d 1067, 1071 (7th Cir. 1993) (stating that Rule 41(b) governs characterization of a dismissal under Rule 12(b)(6) as with or without prejudice).

For these dismissals, the second part of Rule 41(b) allows a court to specify whether a dismissal is or isn't "an adjudication on the merits." *See* Fed. R. Civ. P. 41(b) (stating that dismissals operate "as an adjudication on the merits" "[u]nless the dismissal order states otherwise"). "An adjudication on the merits" is, simply, a dismissal with prejudice. *See Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 505 (2001) ("'An adjudication upon the merits' is the opposite of 'a dismissal without prejudice.'" (quoting Fed. R. Civ. P. 41(b)); *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396 (1990) ("'[D]ismissal . . . without prejudice' is a dismissal that does not 'operat[e] as an adjudication upon the merits . . . .'" (quoting Fed. R. Civ. P. 41(a))). So Rule 41(b) allows the district court to say whether a dismissal under Rule 12(b)(6) is or isn't an

9

"adjudication on the merits" or, put another way, whether the dismissal is with or without prejudice.[7] *See* 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2373 (4th ed. 2020) ("If the court does not specify that the dismissal is without prejudice, and the basis for it comes within the terms of the final sentence of Rule 41(b), it will be treated as being with prejudice."). So a dismissal under Rule 12(b)(6) can be with or without prejudice. *See Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 132 (D.C. Cir. 2012) (Kavanaugh, J., concurring) ("[U]nder Rules 41(b) and 12(b)(6), a district court has discretion to dismiss a complaint without prejudice when the district court concludes that

---

[7] Judge Briscoe suggests that this rule allows only the district court (rather than our court) to specify that the dismissal is without prejudice. Judge Briscoe's Partial Concurrence & Partial Dissent at 17–18 n.8. I agree. But here the district court itself specified that the dismissal was for lack of jurisdiction, which—by definition—is a dismissal without prejudice. So affirmance does not change the nature of the dismissal. The existing dismissal remains one without prejudice.

circumstances so warrant.").[8] We thus have no reason to change the district court's disposition; we can instead simply affirm.[9]

Judge Briscoe also suggests that this "middle path" implicates the cross-appeal rule. Judge Briscoe's Partial Concurrence & Partial Dissent at 22. She invokes the Supreme Court's observation that the rule applies to "prevent lessening of the rights of the appellant." *Id.* (citing *Jennings v. Stephens*, 574 U.S. 271, 276 (2015)); *see* note 2, above. But affirming the dismissal without prejudice does not lessen the rights of the political subdivisions. The disposition of their claims remains the same: It was without prejudice and stays that way.

---

[8]    Indeed, we have required some dismissals under Rule 12(b)(6) to be without prejudice, such as those for prematurity under *Heck v. Humphrey*, 512 U.S. 477 (1994), failure to exhaust administrative remedies, and prudential ripeness. *See Fottler v. United States*, 73 F.3d 1064,1065–66 (10th Cir. 1996) (prematurity under *Heck*); *Gallagher v. Shelton*, 587 F.3d 1063, 1068 (10th Cir. 2009) (failure to exhaust administrative remedies); *N. Mill Street, LLC, v. City of Aspen*, 6 F.4th 1216, 1320 & n.22 (10th Cir. 2021) (prudential ripeness).

[9]    Chief Judge Tymkovich states that I agree that we are adjudicating the substance of the claim. Chief Judge Tymkovich's Concurrence at 18 n.10. But adjudication of the *substance* of a claim differs from adjudication of the *merits*. We often loosely say that a ruling is "on the merits" when it addresses the substance of a claim. *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 501–02 (2001). But Rule 41(b) uses the term "adjudication upon the merits" to refer to a dismissal with prejudice (even if the ruling addressed the substance of the claim). *Id.* at 502, 505–06. The majority has not ordered dismissal with prejudice, so the Court has not made an adjudication upon the merits under Rule 41(b).

11

Judge Briscoe states that affirmance of the dismissal without prejudice erroneously "focuses only on the ultimate judgment while ignoring the substantive legal pronouncements that precede it." Judge Briscoe's Partial Concurrence & Partial Dissent at 23. But the cross-appeal rule requires us to focus on the district court's judgment rather than the reasoning behind it.

The Supreme Court addressed this issue in *Jennings v. Stephens*, 574 U.S. 271 (2015). There the Court considered whether a habeas petitioner had needed to file a cross-appeal to defend the judgment itself (a grant of habeas relief) based on a theory that the district court had rejected. *Id.* at 273–75. The State argued that the petitioner had needed to cross-appeal because he was seeking to diminish the State's rights at the retrial. *Id.* at 277. The Supreme Court rejected this argument, reasoning that we consider the need for a cross-appeal based on the district court's judgment rather than its reasoning: "A prevailing party seeks to enforce not a district court's reasoning, but the court's *judgment*. This Court, like all federal appellate courts, does not review lower courts' opinions, but their *judgments*." *Id.* at 277 (citation omitted; emphasis in original). The Court reasoned that the petitioner wasn't trying to change the judgment itself (an order for the State to either release the petitioner, resentence him, or commute his sentence). *Id.* at 800. So he didn't need to cross-appeal even

12

though adoption of his appellate theory would allow him to pursue a habeas theory that the district court had rejected. *Id.* at 799–802.

The same is true here. The district court dismissed the action for lack of jurisdiction, which is treated as a dismissal without prejudice. Like the Supreme Court in *Jennings*, we consider the need for a cross-appeal based on the scope of the district court's judgment rather than the reasoning behind it. The district court dismissed the action for lack of jurisdiction, which the majority has treated as a dismissal without prejudice. Affirming that dismissal without prejudice does not expand or diminish any party's rights from the judgment itself. So no cross-appeal is needed for us to affirm the dismissal as one without prejudice—just as no cross-appeal was needed in *Jennings* to affirm the habeas judgment based on a theory that the district court had rejected.

*  *  *

In my view, the majority properly characterizes the restriction on claims by political subdivisions. But we need not change the dismissal without prejudice to one with prejudice. Dismissals under Rule 12(b)(6) can be without prejudice. So the majority easily avoids the cross-appeal rule by leaving the dismissal as one without prejudice.

Chief Judge Tymkovich would ignore the cross-appeal rule, reasoning that the change in disposition makes no practical difference. This approach would muddy our precedent: The change made no practical

13

difference in *June v. Union Carbide*, and we held there that the cross-appeal rule prevented us from changing the dismissal without prejudice to one with prejudice. Chief Judge Tymkovich cites *June* but then questions its conclusion, taking an approach that would confuse future panels and litigants. The majority properly resists that approach, leaving our precedent intact by affirming and leaving the dismissal without prejudice.

No. 17-1192, *Kerr v. Polis*

**BRISCOE**, Circuit Judge, concurring in part and dissenting in part, joined by
**PHILLIPS**, Circuit Judge.

I agree with the majority that the limitation on political subdivision suits against a
parent state (what we used to call "political subdivision standing") is not a threshold
jurisdictional inquiry. Instead, this limitation is a merits analysis that looks to whether a
constitutional or statutory provision allows a subdivision to bring a claim against its
parent state. Accordingly, the district court erred in considering that issue on a
Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, and we should
reverse that ruling and remand for further proceedings.

And that should end the story. This is an appeal from the district court's dismissal
for lack of *jurisdiction*. The majority, however, sees that as irrelevant and goes beyond
the district court's ruling by dismissing the plaintiffs' complaint *on the merits*. In its
view, we are "required" to convert the motion the Governor did file into one he did not,
consequently hold the plaintiffs to a standard that has not yet been applied to them, and
then simply "correct" the district court's judgment because, the majority declares, after
ten years "the day has come to affirm the dismissal of the complaint." Maj. Op. at 6, 27–
28. To smooth over this metamorphosis, the majority styles its opinion as affirming on
"alternate grounds," rather than describing its work for what it is: a reversal on alternative
grounds.[1] Maj. Op. at 5, 12–13, 26–29.

---

[1] We have discretion to affirm on alternative grounds if three conditions are met:
(1) if "the ground was fully briefed and argued here and below"; (2) if "the parties have
had a 'fair opportunity to develop the [factual] record'"; and (3) if, "in light of factual

The majority's resolution flies in the face of the cross-appeal rule, which states that we may not enlarge the rights of a non-appealing party nor shrink the rights of the appealing party without a cross-appeal. *Jennings v. Stephens*, 574 U.S. 271, 276 (2015). We all agree that the district court erred in characterizing the political subdivision "standing" doctrine as jurisdictional. The proper course is therefore to reverse and remand. The district court would then be free to hear any merits arguments on a Rule 12(b)(6) motion that the Governor might raise and decide for itself whether the plaintiffs have stated a claim. It could interpret the Colorado Enabling Act and the Guarantee Clause in the first instance.

Yet the majority decides these issues for the district court. In doing so, the majority gives the Governor more than he asked for and leaves the plaintiffs with nothing—no live case, and no viable path towards refiling. While the majority views its ruling as compliant with the cross-appeal rule, the reality is to the contrary. The Governor greatly benefits from the majority's reading of the applicable case law, while the

---

findings to which we defer or uncontested facts, our decision would involve only questions of law." *Elkins v. Comfort*, 392 F.3d 1159, 1162 (10th Cir. 2004) (internal citations omitted). We do not, however, have discretion to *reverse* on alternative grounds. *See Hayes v. SkyWest Airlines, Inc.*, 12 F.4th 1186, 1201 (10th Cir. 2021) ("[W]e hesitate to *reverse* a district court on an unraised theory."). Although the majority labels its ruling as affirming on alternative grounds, in spite of that label the majority affirms no ruling or rationale adopted by the district court. At any rate, the merits issues now advanced by the majority were not fully briefed here, and not briefed at all to the district court; the parties have not had a chance to develop the factual record; and the decision does not turn on a pure question of law. As such, affirming on alternative grounds does not satisfy the requirements set forth in *Elkins*. *See Elkins*, 392 F.3d at 1162.

2

plaintiffs are left with a merits dismissal without prejudice rather than a ruling to reverse and remand for further proceedings.

In the majority's efforts to dispose of this case once and for all, it violates the cross-appeal rule, ignores the key role played by the parties' participation in their own litigation, and flouts our role as a court of review. The majority today transforms this case from a Rule 12(b)(1) dismissal for lack of standing to a Rule 12(b)(6) dismissal *on the merits*. To that end, the majority announces "the proper framework for determining whether a political subdivision has stated a viable claim against its parent state," then proceeds to apply that analytical framework to this case as it presently stands without affording the plaintiffs the opportunity to meet these newly minted standards in a Rule 12(b)(6) context, and given their lack of opportunity to meet these new Rule 12(b)(6) standards, finds the plaintiffs' arguments wanting. Maj. Op. at 12. I respectfully dissent, both from the majority's conclusion of what the political subdivision limitation inquiry entails, and from its decision to dismiss the complaint. Because we conclude that the political subdivisions here do have Article III standing to challenge TABOR—the only inquiry that matters on review of this Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction—I would reverse the district court's Rule 12(b)(1) ruling and remand.

## I

I will begin with where the majority gets it right. The majority correctly holds that the political subdivision plaintiffs have Article III standing, and that our political subdivision "standing" doctrine is not jurisdictional and therefore not properly considered

3

on a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. The Supreme Court made clear in *Lexmark* "that courts err by characterizing as a question of 'standing' the issue of whether a particular litigant is authorized to bring a substantive claim under a statute." *United States v. Wells*, 873 F.3d 1241, 1261 (10th Cir. 2017) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127–28 (2014)). Accordingly, referring to this merits analysis as a "limitation" on political subdivisions whenever they bring a suit against their parent state is more appropriate and will limit the risk that future courts or parties err by treating this question as a matter of jurisdiction.

## II

But that is where I part ways with the majority. In my view, our decision in *City of Hugo v. Nichols (Two Cases)*, 656 F.3d 1251 (10th Cir. 2011), either unnecessarily narrowed the ability of a political subdivision to sue its parent state or has been misread to do so. Today, the majority further erodes—and may have completely eliminated—that ability in two ways. First, the majority all but forecloses subdivisions from bringing constitutional challenges against their parent state, unnecessarily expanding Supreme Court precedent. Second, the majority imposes a "plain statement" rule on any statutory claims subdivisions might bring. Third, it converts a Rule 12(b)(1) motion into a Rule 12(b)(6) motion, concludes from the plaintiffs' failure to fully brief Rule 12(b)(6) issues that plaintiffs have no legislative history or other interpretive aids to present, and then dismisses this action on the merits. These moves are unnecessary and incorrect.

4

## A. Constitutional Challenges

The Supreme Court has only expressly prohibited a political subdivision from suing its parent state for violations of three constitutional provisions: (1) the Contracts Clause, *City of Trenton v. State of New Jersey*, 262 U.S. 182, 187–88 (1923), (2) the Due Process Clause of the Fourteenth Amendment, *id.*, and (3) the Equal Protection Clause of that amendment, *Williams v. Mayor & City Council of Baltimore*, 289 U.S. 36, 40 (1933). In those cases, the Supreme Court did not articulate a test for determining which constitutional provisions a subdivision could rely on in a suit against its parent state. Instead, the Court broadly stated that political subdivisions "ha[ve] no privileges or immunities under the Federal Constitution which [they] may invoke in opposition to the will of [their] creator." *Williams*, 289 U.S. at 40.

But the Supreme Court has since backed away from that sweeping prohibition. In *Gomillion v. Lightfoot*, the Supreme Court cautioned that *Trenton* and *Williams* should be read only to reach "the particular prohibitions of the Constitution considered in those cases," i.e., the Contracts, Due Process, and Equal Protection Clauses. 364 U.S. 339, 344 (1960). It is true that limiting directive was dictum, as that case did not involve a political subdivision suing its parent state. But that dictum was made in an extensive discussion of those early twentieth century cases. And when the Supreme Court tells us how broadly or narrowly to interpret its holdings, we should listen. *Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996) ("[T]his court considers itself bound by Supreme Court dicta almost as firmly as by the Court's outright holdings . . . .").

The majority ignores that limiting directive and instead adopts, with very little analysis, the standard formulated in *City of Hugo*—a decision which effectively foreclosed *all* constitutional challenges that a subdivision might bring against their parent state. In that case, a panel of this court, over a strong dissent, extended the limitation on constitutional challenges to the dormant Commerce Clause. *See* 656 F.3d at 1258; *id.* at 1265 (Matheson, J., dissenting). In doing so, the *City of Hugo* panel said that a political subdivision could not sue its parent state based on a "substantive" constitutional provision—that is, a provision that "provide[s] substantive restraints on state action" and "concerns rights that are properly characterized as guaranteed to individuals." *Id.* at 1262 (majority opinion). Rather, the *City of Hugo* panel held, a subdivision could only sue its parent state "to vindicate substantive federal *statutory* rights through the Supremacy Clause." *Id.* (emphasis added); *but see id.* at 1270–71 (Matheson, J., dissenting) (concluding that subdivisions are not limited to pursuing only statutory claims). That conclusion rested primarily on two premises. First, that there was not "a single case in which the Supreme Court or a court of appeals has allowed a political subdivision to sue its parent state under a substantive provision of the Constitution." *Id.* at 1257 (majority opinion). And second, that the Supreme Court had apparently resurrected the sweeping prohibition against constitutional challenges from the early twentieth century. *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 363 (2009) ("[A] political subdivision . . . 'has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator.'" (quoting *Williams*, 289 U.S. at 40)); *City of Hugo*, 656 F.3d

6

at 1259, 1263. Relying on those same points today, the majority adopts *City of Hugo*'s total bar on constitutional challenges wholesale.

I question each of those premises. As for the first, just because the Supreme Court has expressly prohibited political subdivisions from relying on certain constitutional provisions does not mean the Court intends to prohibit reliance on all constitutional provisions. *See Edwards v. Vannoy*, 141 S. Ct. 1547, 1581 (2021) (Kagan, J., dissenting) ("That the Court has not found a watershed rule since *Teague* does not mean it could or would not in the future."). Rather than prescribe broad general rules that may yield unforeseen consequences when later applied in a different context, I believe the better, more judicious, path is to rule narrowly on issues as they arise.

Relatedly, as regards the second premise, I am reluctant to totally prohibit a subdivision from bringing a constitutional challenge against its parent state in the absence of close examination of the issue by the Supreme Court. *Ysursa*, the case that allegedly resurrected the total bar on constitutional challenges, was a case about union dues, not about the rights of political subdivisions. The Court only invoked the sweeping dicta from *Trenton* and *Williams* to reject an argument that the relationship between a state and a political subdivision was like that between a state regulator and a private utility company. *Ysursa*, 555 U.S. at 363 ("That analogy is misguided. A private corporation is subject to the government's legal authority to regulate its conduct. A political subdivision, on the other hand, is a subordinate unit of government created by the State to carry out delegated governmental functions."); *see also City of Hugo*, 656 F.3d at 1269 n.7 (Matheson, J., dissenting) ("*Ysursa* cites to *Trenton* and *Williams*, but only to

7

establish that states may impose regulations on local governments, not that those regulations are immune from constitutional scrutiny."). As the majority's author put it in a similar context, "I therefore doubt" that in invoking such dicta only to reject an analogy, "the Supreme Court was laying down the law for all time in all contexts . . . ." *Utah Republican Party v. Cox*, 892 F.3d 1066, 1111 (10th Cir. 2018) (Tymkovich, C.J., concurring in part and dissenting in part). While we are "bound by Supreme Court dicta *almost* as firmly as by the Court's outright holdings . . . we generally do not follow dicta that has been completely assumed and unreasoned." *Id.* at 1110–11 (quoting *Gaylor*, 74 F.3d at 217, and collecting cases) (emphasis added).

Ultimately, however, between the limiting directive from *Gomillion* and the sweeping prohibition from *Ysursa*, it appears that we have dicta from the Supreme Court pointing in two different directions. But given that the Supreme Court has neither recently nor thoroughly considered the types of constitutional challenges a political subdivision may bring against its parent state, I would follow the narrower dicta that speaks to the sweep of the Court's holdings, rather than the dicta invoked to reject an analogy in an inapposite context. Accordingly, I would adhere only to the Supreme Court's (and our court's) actual holdings: political subdivisions cannot sue their parent states based on violations of the Contracts Clause, the Due Process or Equal Protection Clauses of the Fourteenth Amendment, or the dormant Commerce Clause.[2]

---

[2] Although I disagree with how broadly *City of Hugo* spoke about constitutional challenges, I see no need to disregard that case's actual holding.

I see no need to determine whether the Guarantee Clause should be added to that list. As the majority notes, the subdivision plaintiffs have all but abandoned their claim under that provision of the Constitution. Maj. Op. at 31 ("Faced with near-certain failure on their Guarantee Clause claim, the Plaintiffs place most of their eggs in the Enabling Act basket on appeal."). In the section of their supplemental en banc brief regarding political subdivision "standing," the plaintiffs focus only on their Enabling Act claim. *See* Aplt. Supp. Br. at 10 ("The political subdivision plaintiffs have standing to pursue their claims under the Enabling Act . . . ."); *id.* at 16 ("The Enabling Act through the Supremacy Clause controls."). Accordingly, I would deem the plaintiffs' constitutional claims under the Guarantee Clause waived. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed . . . are waived."). And, more consequentially, I would not use these specific plaintiffs' lack of argument on their Guarantee Clause claim as an occasion to slam the door on all constitutional claims brought by all political subdivisions. Unless and until the Supreme Court announces such a prohibition, I see no need to impose such a bar now.

## B. Statutory Claims

Continuing its analysis, the majority substantially narrows a political subdivision's ability to rely on a federal statute in a suit against its parent state. Adopting the standard from *City of Hugo*, the majority holds that a federal statute must be "directed at protecting" political subdivisions. And, in its view, a statute is only "directed at protecting" political subdivisions if the statute specifically provides rights to political subdivisions. Maj. Op. at 22 ("[W]e must determine whether Congress specifically

intended to create a cause of action for political subdivisions."). This requirement, the majority insists, ensures that "Congress has specifically weighed the federalism implications of a given statute and determined political subdivisions have a particular interest in enforcing the law." *Id.* at 24–25. In essence then, the majority adopts a "plain statement" rule—familiar from Supreme Court cases where the federal-state balance is at issue, *see, e.g.*, *United States v. Bass*, 404 U.S. 336, 349 (1971); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989)—and holds that courts should find such a plain statement *only* if it exists in the language of the statute.

To reach this conclusion however, the majority does substantial surgery to our political subdivision limitation doctrine. This court has issued three key decisions exploring the contours of the political subdivision limitation, each building upon the other: *Hous. Auth. of Kaw Tribe of Indians of Okla. v. City of Ponca City*, 952 F.2d 1183, 1190 (10th Cir. 1991) (*Kaw Tribe*), *Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 628 (10th Cir. 1998), and most recently, *City of Hugo*, 656 F.3d at 1251. In the majority's telling, the analysis essentially begins and ends with *City of Hugo*—or, more precisely, the majority's preferred parts of *City of Hugo* that support its conclusion. Indeed, in its discussion of the relevant cases, the majority breezes by *Kaw Tribe*, writes that case out of the subsequent development of the doctrine, and then, when it becomes clear that *Kaw Tribe* conflicts with the rule the majority derives, sidesteps the case entirely by concluding without support that plaintiffs "had every opportunity to present" legislative history and other interpretive aids but have failed to present any. Maj. Op. at 25–26 n.8. But ducking *Kaw Tribe* like this and negating the plaintiffs' opportunity to ever address

10

*Kaw Tribe* in the context of a Rule 12(b)(6) motion will lead to consequences far beyond this case. The Governor filed a Rule 12(b)(1) motion and the plaintiffs responded to that motion. Nevertheless, the majority now penalizes plaintiffs for not also raising all conceivable responses to a Rule 12(b)(6) motion that was never filed. In fact, the Governor made no reference to Rule 12(b)(6) until supplemental briefing for rehearing en banc.[3]

In *Kaw Tribe*, we held that a tribal housing authority established under Oklahoma law could not sue a fellow political subdivision[4] under the Fourteenth Amendment, following the prohibition on such challenges established by the Supreme Court in *Trenton* and *Williams*. 952 F.2d at 1190. At the same time, we held that the housing authority *could* maintain a suit under the Fair Housing Act (FHA), because the housing authority fell within the Supreme Court's broad interpretation of who was an "aggrieved person" that could bring a suit under that act. *Id.* at 1193–95. Importantly, we reached this conclusion even though the FHA's definition of a "person" did not include political subdivisions like the housing authority. In other words, the FHA did *not* specifically provide rights to political subdivisions. *Id.* at 1193. Nevertheless, we held that "[i]t [wa]s

---

[3] The majority unabashedly faults the plaintiffs for not briefing this issue to the district court, on initial panel hearing, or to the en banc court, but the suggestion of converting the Governor's Rule 12(b)(1) motion to a Rule 12(b)(6) motion was not raised until oral argument of the en banc case. *See* Oral Argument at 53:35, *Kerr v. Polis* (No. 17-1192) (en banc). I would suggest this shift in theory comes too late to provide the parties notice or an opportunity to be heard. Further, by this approach, we leave the district court totally out of the equation.

[4] That the housing authority brought a suit against a fellow subdivision rather than its parent state did not impact the analysis. *Kaw Tribe*, 952 F.2d at 1189.

11

clear" from the Supreme Court's past rulings and the legislative history of the FHA "that

Congress intended to summon all available forces to 'vindicat[e] a policy that Congress

considered to be of the highest priority.'" *Id.* at 1195 (quoting *Trafficante v. Metropolitan*

*Life Ins.*, 409 U.S. 205, 211 (1972)) (alteration in original).

The next case to develop the political subdivision limitation was *Branson*. At issue

there was a provision of the Colorado Enabling Act that "granted more than 4.6 million

acres of school lands to the state of Colorado for the support of the 'common schools.'"

161 F.3d at 629. Making our own inferential leap from the statute, we recognized that the

school district plaintiffs in that case were "the direct political descendants of those 19th

Century 'common schools,'" and thus "'essentially' the beneficiaries of the federal trust"

established by the Colorado Enabling Act. *Id.* We therefore held that the school districts

could enforce the terms of that provision against the state's contrary actions via the

Supremacy Clause, even though the Enabling Act did not specifically provide rights to

the school districts as political subdivisions. *Id.* In justifying that conclusion, we

recognized that "[t]his understanding of political subdivision standing seems also to have

been at work in this court's own decision [in *Kaw Tribe*]." *Id*; *see also id.* at 630

("Implicit in our decision in *Kaw Tribe* is the view that the Fair Housing Act, as a federal

statute, trumps any contradictory state law through the operation of the Supremacy

Clause."). We then made it clear: our political subdivision rule is "supported by . . . *Kaw*

*Tribe*." *Id.*

Fast forward to the next case, *City of Hugo*, which placed a new gloss on the

limitation. There, we said that "in each case" where a subdivision could sue its parent

12

state, "the source of substantive rights was a federal statute *directed at protecting*

political subdivisions . . . ." 656 F.3d at 1257 (emphasis added).[5] Perhaps confusingly, we

also said that "courts have allowed such suits only when Congress has enacted statutory

law *specifically providing rights to municipalities*." *Id.* (emphasis added). But for that

statement to be consistent with *Kaw Tribe* and *Branson*, it must be construed broadly,

either as part of a disjunctive test, or as an interchangeable label for the more flexible

"directed at protecting" standard. At least one other member of this court agrees with this

reading. *See Kerr III*, 930 F.3d at 1200 (Holmes, J., dissenting) ("*City of Hugo* requires

that [subdivision plaintiffs] seek to enforce a federal statute directed at protecting *or*

specifically providing rights to political subdivisions (sometimes referred to collectively

herein as the 'directed at protecting' requirement)." (emphasis added and citation

omitted)). Indeed, *City of Hugo* itself indicated that a statute need not specifically provide

rights to a subdivision: it pointed to *Kaw Tribe* as an illustrative example where a

political subdivision "fell within the group of aggrieved parties to whom the Act

*contemplated* providing rights," not within the group which were *specifically* provided

rights under the Act. 656 F.3d at 1257 (emphasis added).

      With that review of all the relevant cases in mind, the "directed at protecting"

requirement must have a broader and more flexible scope than the majority gives it,

---

[5] For what it is worth, this standard addressing which statutory claims a political subdivision may pursue against its parent state was unnecessary to the holding and therefore dicta. As we pointed out in the panel decision below, "*City of Hugo*'s analysis focused on whether substantive constitutional rights can be the basis for political subdivision standing and did not itself engage in any statutory analysis." *Kerr v. Polis*, 930 F.3d 1190, 1196 (10th Cir. 2019) (*Kerr III*).

13

particularly if the majority is relying on *City of Hugo* and the precedent it rests upon to get there. But the majority does not want to follow this precedent; it wants to end this case today. So, the majority converts a Rule 12(b)(1) motion into a Rule 12(b)(6) motion upon rehearing en banc. It then concludes from plaintiffs' failure to fully brief a response to a Rule 12(b)(6) motion that plaintiffs must not have the kind of interpretive aids *Kaw Tribe* allows us to consider.

I am puzzled how we can fault the plaintiffs at this juncture, as does the majority, for failing to cite pertinent legislative history when the parties have not had the opportunity to address that issue in the context of a Rule 12(b)(6) motion. To recall, and as the majority fully explains, the focus of this litigation since its 2011 inception has been to determine who has standing to bring an action to seek injunctive and declaratory relief from TABOR. Maj. Op. at 7–10. The majority today concludes standing is intertwined with the merits and if analyzed under the framework the majority now announces the plaintiffs have failed to state a claim and the action is dismissed without prejudice under Rule 12(b)(6).[6] That is quite a leap from where the parties started and from the district court's ruling presently under review. While we may believe we are capable of functioning in a dual role to both identify and then resolve the issues identified, I for one

---

[6] The majority also cites *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995) for the proposition that the en banc court is "required" to convert the Rule 12(b)(1) motion into a Rule 12(b)(6) motion when jurisdictional questions are intertwined with the merits. Maj. Op. at 27–28. This statement mischaracterizes *Holt*'s holding. In *Holt*, we addressed what action was required by *the district court* and not by this court acting unilaterally on appeal.

14

continue to rely on the adversarial process to identify and refine the legal issues before ruling on them.

I would harmonize all our precedent and give the "directed at protecting" requirement the broad and flexible scope that our cases ascribe to it. Accordingly, in my view, a statute may be "directed at protecting" political subdivisions even if the language of the statute does not specifically provide rights to them, so long as there is some other evidence that Congress contemplated protecting political subdivisions. *See Kaw Tribe*, 952 F.2d at 1194 (noting the Congressional theory behind the Fair Housing Act's broad enforcement provision was that even "those who were not the direct objects of discrimination had an interest in ensuring fair housing, as they too suffered" (quoting *Trafficante*, 409 U.S. at 210)). *Cf. United States v. Alabama*, 791 F.2d 1450, 1456 (11th Cir. 1986) ("Nothing in Title VI *or its legislative history* suggests that Congress conceived of a state instrumentality as a 'person' with rights under this statute." (emphasis added)). Contrary to the majority's contention, federalism concerns do not require us to look only at the language of a statute and nothing more to determine whether Congress has spoken clearly on an issue affecting the federal state balance. One of the cases the majority cites for its "plain statement rule" explicitly refers to "statutory structure" and "legislative history" as relevant to the "plain statement" inquiry. *Nixon v. Mo. Mun. League*, 541 U.S. 125, 141 (2004). Contrary to this precedent, the majority looks only at the language of the statute to determine whether Congress has spoken

15

clearly on an issue affecting the federal-state balance because plaintiffs "have failed to present any pertinent legislative history." Maj. Op. at 25–26 n.8.[7]

This more flexible understanding of the "directed at protecting" requirement falls between two points: it is less demanding than the majority's "specifically providing rights to" formulation but requires more than the subdivision plaintiffs' requested zone-of-interests test, which merely asks whether the plaintiff "is arguably within the zone of interests to be protected . . . by the statute . . . in question." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970). In charting out the middle ground, a more flexible understanding of "directed at protecting" remains faithful to our precedent, while recognizing the federalism concerns that animate this entire doctrine.

The district court's analysis in this case focused on the "specifically providing rights to" formulation from *City of Hugo*, which, as should be clear by now, is simultaneously too narrow and inconsistent with existing circuit precedent. *See Kerr v. Hickenlooper*, 259 F. Supp. 3d 1178, 1191 (D. Colo. 2017) ("Section 4 [of the Enabling Act] does not expressly provide for whom the 'republican in form' requirement is designed."). Accordingly, I would reverse the district court's decision and remand for new briefing and consideration of the more flexible "directed at protecting" standard. After all, I continue to believe, as I did in the panel majority, that "[e]stablishing *who* was intended to benefit from the Enabling Act's 'republican in form' requirement necessarily

---

[7] Strangely, the majority holds this omission against the plaintiffs while excusing the Governor's omission of any argument to the district court that plaintiffs' complaint fails to state a claim.

16

begs the question of *what* a 'Republican Form of Government' is." *Kerr III*, 930 F.3d at 1196 (emphasis in original). The determination of that merits question more appropriately belongs with the district court—not this court.

### III

Which brings me to the majority's resolution of this case. I believe it is improper to proceed to consider the merits of this case. The only motion that has been filed in this case is a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, and it is a ruling on that motion that we are reviewing. No matter, says the majority. We can simply convert the Rule 12(b)(1) dismissal into a Rule 12(b)(6) dismissal and dismiss the complaint on the merits. Not only does this move violate the cross-appeal rule, a "firmly entrenched" rule of appellate practice, *Greenlaw v. United States*, 554 U.S. 237, 245 (2008), it more importantly flouts our role as a court of review.

It is well-settled that under the cross-appeal rule, "an appellee who does not cross-appeal may not 'attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary.'" *Jennings*, 574 U.S. at 276 (quoting *United States v. Am. Ry. Express Co.*, 265 U.S. 425, 435 (1924)). The cross-appeal rule clearly applies in this case.[8] Regardless of whether the dismissal is converted

---

[8] To state the obvious, Judge Bacharach and I agree on this point. But I find no support in any similar case from this circuit where we have adopted the hybrid approach that he and the majority take: to momentarily set aside the cross-appeal rule and convert a Rule 12(b)(1) motion to dismiss into a Rule 12(b)(6) motion to dismiss, then dismiss *without* prejudice. The cases cited in support of dismissal under Rule 12(b)(6) *without* prejudice are limited to claims that are premature, unexhausted, or unripe.

Further, we should not now insert Rule 41(b) into the conversation as it has no applicability here. Nor, for that matter, has any party argued that it applies. Rule 41(b)

17

from one without prejudice to one with prejudice, as the Chief Judge's concurrence proposes, the majority opinion and Judge Bacharach's concurrence still contravene the cross-appeal rule by altering the respective rights of both the plaintiffs and the Governor. The plaintiffs' rights are lessened, while the Governor's rights are increased. If this approach complies with the cross-appeal rule, the rule applied here can only be described as "cross-appeal lite." It is not a procedure in full compliance with the cross-appeal rule, but rather some watered-down version of it.

As Judge Bacharach correctly notes, converting a dismissal without prejudice into one with prejudice would enlarge the district court's judgment.[9] It would lessen the rights

---

states in full: "If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it. *Unless the dismissal order states otherwise*, a dismissal under this subdivision (b) and any dismissal not under this rule—except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19—operates as an adjudication on the merits." (emphasis added).

We are not here on a Rule 41(b) motion, nor does it apply. We need not now provide a default label for the district court's ruling. The district court specified that its dismissal was for lack of subject matter jurisdiction, an exception to Rule 41(b)'s presumption of a merits adjudication. As stated by then-Judge Kavanaugh, "a *district court* has discretion to dismiss a complaint without prejudice." *Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 132 (D.C. Cir. 2012) (Kavanaugh, J., concurring) (emphasis added). Nor does *Paganis v. Blonstein*, 3 F.3d 1067 (7th Cir. 1993) support our now relabeling the district court's ruling. In *Paganis* the court cited Rule 41(b) for the unremarkable holding that the district court's dismissal of plaintiff's action *under Rule 12(b)(6)* is a dismissal *with prejudice* even though the district court did not expressly include that phrase. *Id.* at 1071. *Paganis* does not involve a Rule 12(b)(1) dismissal or provide support for our changing the district court's Rule 12(b)(1) dismissal to a Rule 12(b)(6) dismissal without prejudice.

[9] As the Chief Judge's concurrence recognizes, a Rule 12(b)(1) dismissal is typically without prejudice and allows a party to return to the same court and attempt to cure the jurisdictional defect. *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 505 (2001) ("The primary meaning of 'dismissal without prejudice,' we think, is dismissal without barring the plaintiff from returning later, to the same court, with the

18

of the political subdivisions, who would be barred from bringing these claims in federal court in Colorado, and it would increase the rights of the Governor, who would obtain a windfall ruling on the merits that he did not receive below nor seek on appeal. Because the Governor did not file a cross-appeal, we are prohibited from taking this action. *June v. Union Carbide Corp.*, 577 F.3d 1234, 1248 n.8 (10th Cir. 2009) ("[The cross-appeal] rule . . . preclude[s] an appellate court, in the absence of a cross-appeal, from changing a dismissal without prejudice to a dismissal with prejudice.").

The Chief Judge's concurrence dismisses the cross-appeal rule, saying it simply does not apply in this case. But its reasons for doing so are unconvincing. To start, "in more than two centuries of repeatedly endorsing the cross-appeal requirement, not a single one of [the Supreme Court's] holdings has ever recognized an exception to the rule." *Greenlaw*, 554 U.S. at 245 (quoting *El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 480 (1999)). The only Supreme Court case the concurrence relies on—*Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 254 (2010)—did not discuss the cross-appeal rule at all. Additionally, the Seventh Circuit cases the concurrence invokes appear to be unique to their specific immigration context. *See Matushkina v. Nielsen*, 877 F.3d 289, 297 (7th Cir. 2017); *Morfin v. Tillerson*, 851 F.3d 710, 714 (7th Cir. 2017); *Hazama v.*

---

same underlying claim."); *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216 (10th Cir. 2006). In contrast, a Rule 12(b)(6) dismissal is typically with prejudice, unless otherwise noted, because such a dismissal adjudicates a plaintiff's claims on the merits and determines that the plaintiff fails to state a claim upon which relief can be granted. *Brereton*, 434 F.3d at 1219; *see Semtek*, 531 U.S. at 506 ("[U]nlike a dismissal 'without prejudice,' the dismissal in the present case [designated as 'on the merits and with prejudice'] barred refiling of the same claim in the [same court]." (alterations added)).

19

*Tillerson*, 851 F.3d 706, 710 (7th Cir. 2017). Those cases dealt with consular non-reviewability in the immigration context and converted dismissals for lack of standing into dismissals on the merits. In *Matushkina*—the only case to actually discuss and analyze the cross-appeal rule—the Seventh Circuit stated that "[t]he general [cross-appeal] rule does not apply . . . where a jurisdictional dismissal effectively bars relief on the merits in any judicial forum." 877 F.3d at 297. In my view, that general statement is confined to the circumstances of that case, where the line between standing and consular non-reviewability is "rather fine" and consular non-reviewability effectively bars relief on the merits in any judicial forum. *Id.* at 294 ("Consular nonreviewability is the general rule that decisions to issue or withhold a visa are not reviewable in court unless Congress says otherwise." (internal quotations omitted)). Here, in contrast, standing and the political subdivision limitation are totally distinct, and the subdivision limitation, at least in theory, does not effectively bar relief in any judicial forum.

At any rate, in a different line of cases, the Seventh Circuit has held fast to the cross-appeal rule. Most notably, in *Lee v. City of Chicago*, 330 F.3d 456, 470–71 (7th Cir. 2003), the Seventh Circuit reversed the dismissal of a plaintiff's claims for lack of standing and remanded to the district court to consider the claims on the merits. In doing so, the Seventh Circuit rejected the defendant's argument that the court should proceed to evaluate the merits of the plaintiff's claim in the interests of judicial economy and efficiency. Even though the Seventh Circuit agreed with the defendant that "it [wa]s likely" the plaintiff would be unable to state a claim, the court nevertheless considered itself "foreclosed from resolving th[at] issue here" because "the [defendant] s[ought] to

20

enlarge its rights and supplement the district court's decree with a ruling on the merits that was not reached below." *Id.* at 470–71. The Seventh Circuit held that "[the defendant] c[ould not] do this without filing a cross-appeal." *Id.* at 471; *see also Am. Bottom Conservancy v. U.S. Army Corps of Eng'rs*, 650 F.3d 652, 660 (7th Cir. 2011) ("An appellee who wants, not that the judgment of the district court be affirmed on an alternative ground, but that the judgment be changed, in this case from a dismissal without to a dismissal with prejudice, must file a cross-appeal."); *Alejo v. Heller*, 328 F.3d 930, 937 (7th Cir. 2003) ("[Defendant] seeks to enlarge his rights and supplement the district court's decree with a ruling on the merits that was not reached below. He cannot do this without filing a cross-appeal.").

Other circuits have followed the same path by affording respect to the cross-appeal rule. *See, e.g.*, *Delgado-Caraballo v. Hosp. Pavia Hato Rey, Inc.*, 889 F.3d 30, 39 n.15 (1st Cir. 2018) ("Dismissing plaintiffs' local-law claims on statute-of-limitations grounds would be a dismissal with (rather than without) prejudice—a result that would lessen their rights. So [without a cross-appeal] [the defendants'] argument is not properly before us." (citations omitted)); *Dodd v. Hood River Cnty.*, 59 F.3d 852, 864 (9th Cir. 1995) ("Although the parties fully briefed the merits before the district court and, on appeal, have expressed a willingness for us to decide this issue, we will not consider [it]. The District Court's dismissal was grounded on its own lack of jurisdiction and was without prejudice. The [defendants], having not filed a cross-appeal, may urge any ground that would result in an affirmance of the judgment below in their favor, but may not obtain from us relief more extensive than [they] received from the district court."). *Cf.*

21

*Firefighters' Ret. Sys. v. Grant Thornton, L.L.P.*, 894 F.3d 665, 672 (5th Cir. 2018) ("The district court dismissed Plaintiffs' claims without prejudice, but a dismissal without prejudice may be converted into a dismissal with prejudice when a defendant files a cross-appeal, as [the defendant] has done here.").

While conversion of a dismissal without prejudice into one with prejudice clearly defies the cross-appeal rule, even the middle path now charted by the majority and Judge Bacharach's concurrence implicates the rule. The cross-appeal rule does not apply only to prevent enlargement of judgments in favor of the appellee—it also applies to prevent lessening the rights of the appellant. *See Jennings*, 574 U.S. at 276. Conveniently, neither the majority nor Judge Bacharach address this aspect of the rule. Indeed, the majority opinion does not mention the cross-appeal rule at all. Courts take a broad view of how an appellant's rights could be lessened on appeal. A panel of this court has noted, in an unpublished decision, that even increasing the amount of a bond an appellant posted in connection with a temporary restraining order would require a cross appeal. *See ClearOne Commcn's, Inc. v. Bowers*, 509 F. App'x 798, 802 (10th Cir. 2013) (unpub.) (Gorsuch, J.). The Seventh Circuit has said that upending a district court's preliminary legal determination that favored the eventual appellant would require a cross-appeal because replacing the precedent could cause the appellant to face a steeper burden in future, similar cases. *See EEOC v. Chicago Club*, 86 F.3d 1423, 1432 (7th Cir. 1996).

The majority's approach clearly lessens the plaintiffs' rights and increases their burden in any subsequent litigation. If the majority held that the district court erred in determining that political subdivision standing was a jurisdictional bar, stopped its

22

analysis there, and remanded to the district court for reconsideration, the plaintiffs would be left at least with a live case and the opportunity to brief these merits issues to the district court. By going further than necessary, the majority deprives the plaintiffs of all the benefits of a pending, open case and leaves them and others like them with precedent that makes it almost impossible to bring a claim under the Guarantee Clause or the Colorado Enabling Act.

Judge Bacharach suggests that the Chief Judge's approach would "stymie the political subdivisions, barring them from refiling the suit and presenting new evidence of legislative history." Bacharach Op. at 3–4. Yet they fare no better under the approach Judge Bacharach endorses because the majority opinion creates an all but insurmountable burden to their prevailing on the merits.[10] In fact, after authoring the same merits analysis which Judge Bacharach joins, the Chief Judge notes in concurrence that expanding the dismissal to one with prejudice would have the same practical effect as leaving the dismissal without prejudice. Chief Judge Tymkovich's Concurrence at 18. If expanding the judgment makes no practical difference, then either both courses violate the cross-appeal rule or neither do. Judge Bacharach mischaracterizes the cross-appeal rule as requiring only that we do not expand the "disposition" of the case. Bacharach Op. at 11. But that view focuses only on the ultimate judgment while ignoring the substantive legal pronouncements that precede it and will bind the parties in any future litigation. Moreover, his opinion reads too much into *Jennings*, a habeas case with key differences

---

[10] To be clear, I would in no way restrict the evidence plaintiffs could present should they refile an action.

from this one. There, the alternative argument was actually presented to the district court. *See Jennings*, 574 U.S. at 275. The supposed alternative reasoning for affirmance here was not.

Ultimately, though, how closely we adhere to the cross-appeal rule runs a close second to my larger objection to the majority's decision to usurp the district court's authority and become the first court to consider this case on the merits. We are "a court of review, not of first view." *Childers v. Crow*, 1 F.4th 792, 801 (10th Cir. 2021) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 719 n.4 (2005)); *Reid v. Oklahoma*, 101 F.3d 628, 630–31 (10th Cir. 1996). It should not be a novel concept to acknowledge that the role of an appellate court is to review the rulings of district courts, not to create new issues neither raised nor addressed by the district court or the parties on appeal.

We are here in this en banc proceeding because the parties and members of this court have acknowledged that our political subdivision limitation doctrine is unclear. *See Kerr III*, 930 F.3d at 1195–96 (describing the parties' differing views of which standard applied); *id.* at 1196 n.6 (noting "credible concerns about [*City of Hugo*'s] rule being drawn from our political subdivision standing precedent"); *id.* at 1206 (Holmes, J., dissenting) ("[T]here may be conceivable arguments for reevaluating or cabining our political-subdivision standing doctrine."). Now that we have determined the limitation doctrine is not jurisdictional and have settled on a standard, we should stop there and remand to the district court to consider the case on the merits. Both *Branson* and *City of Hugo* were decided on motions for summary judgment "with access to considerably more information than entailed by the Rule 12(b)(1) motion here." *Id.* at 1199 n.10 (majority

24

opinion). And the district court here acknowledged that it reached its conclusion regarding the Enabling Act "based on the present record," *Kerr*, 259 F. Supp. 3d at 1190–91, which notably, was developed in a jurisdictional context under a different precedential landscape. I therefore disagree with the majority that a remand would be an exercise in futility. Again, I maintain that "[e]stablishing *who* was intended to benefit from the Enabling Act's 'republican in form' requirement necessarily begs the question of *what* a 'Republican Form of Government' is." *Kerr III*, 930 F.3d at 1196 (emphasis in original). To date, no court has answered that question. This court should afford the district court the opportunity to address the issue in the first instance.

## IV

As regards the political question doctrine, this is another issue not addressed by the district court.[11] I disagree with the Chief Judge's suggestion of resolving this case on political question grounds. For one, as stated above, I conclude the plaintiffs waived their claims under the Guarantee Clause of the Constitution, so it is unnecessary to determine whether claims under that provision are non-justiciable. For another, the whole purpose of this en banc proceeding was to clarify the political subdivision "standing" doctrine, not reconsider a prior panel's conclusion that the plaintiffs' claims are justiciable. *See Kerr v.*

---

[11] "A well known riddle asks: 'Where does an eight-hundred pound gorilla sleep?' The response is: 'Anywhere it wants.' The judicial application of this rule would be: 'When will an appellate court consider a new issue?' The response is: 'Any time it wants.'" Robert J. Martineau, *Considering New Issues on Appeal: The General Rule and the Gorilla Rule*, 40 Vand. L. Rev. 1023, 1023 n.a (1987) (internal citation omitted).

*Hickenlooper*, 744 F.3d 1156, 1172–1181 (10th Cir. 2014) (*Kerr I*).[12] Disposing of this

case on political question grounds would leave the subdivision limitation doctrine in

disarray, kicking the can down the road for another day.

---

[12]And for what it is worth, I stand by the unanimous panel opinion in *Kerr I* that I joined. In seeking to overturn that decision's conclusion on the political question doctrine, the concurrence literally re-writes the Supreme Court's decision in *Pacific States* to say what the concurrence wants it to say. *See* Chief Judge Tymkovich's Concurrence at 3–5. Citing only to a law review article and a student note opining on what *Pacific States* was "actually" about, the concurrence says that *Pacific States* dealt with the exact situation as this case and therefore that its declaration that all Guarantee Clause challenges are non-justiciable applies. But as we concluded in *Kerr I*, the challenge in *Pacific States* involved a "wholesale attack[] on the validity of a state's government rather than, as before us, a challenge to a single provision of a state constitution." *Kerr I*, 744 F.3d at 1173. Even if Chief Justice White (the author of *Pacific States*) "filled his opinion with rhetorical hyperbole," Hans A. Linde, *Who is Responsible for Republican Government?*, 65 U. Colo. L. Rev. 709, 714 (1994), *cited with approval in* Concurrence at 4, that does not change what his opinion for the Court actually said. *Pac. States Tel. & Tel. Co. v. State of Oregon*, 223 U.S. 118, 150 (1912) ("[T]he assault which the contention here advanced makes is not on the tax as a tax, but on the state as a state."). Importantly, *Pacific States* cast itself under the precedential force of *Luther v. Borden*, 48 U.S. (7 How.) 1 (1849), which it viewed as "the leading and absolutely controlling case." *Pacific States*, 223 U.S. at 143. That case also involved a "wholesale attack[] on the validity of a state's government" because it asked the Supreme Court "to resolve a dispute that would have required it to determine which of two putative governments legitimately controlled Rhode Island at the time." *Kerr I*, 744 F.3d at 1173. Accordingly, I believe those cases only announced a broad non-justiciability rule for the extreme circumstances considered there. They did not imply that all Guarantee Clause claims of all kinds are non-justiciable, only that "*[s]ome* questions raised under the Guarantee Clause are nonjusticiable." *Id.* at 1176 (quoting *New York v. United States*, 505 U.S. 144, 185 (1992)) (emphasis added); *see Schroder v. Bush*, 263 F.3d 1169, 1173–74 (10th Cir. 2001) ("When deciding whether issues present political questions, courts must make a 'discriminating inquiry into the precise facts and posture of the particular case,' for it resists 'resolution by any semantic cataloguing.' As 'there is no blanket rule,' application of the doctrine must be made on a 'case-by-case' basis." (quoting *Baker v. Carr*, 369 U.S. 186, 211, 215, 217 (1962)).

Most importantly, the political question issue was not "presented" to us in any meaningful sense of the word. At no point in the instant proceedings on review did the Governor raise the political question doctrine. He certainly had the opportunity to do so.[13] Normally, "when a party chooses not to pursue a legal theory potentially available to it, we generally take the view that it is 'inappropriate' to pursue that theory in our opinions." *Hydro Res., Inc. v. EPA*, 608 F.3d 1131, 1146 n.10 (10th Cir. 2010) (en banc) (Gorsuch, J.). That is because "we rely on the parties to frame the issues for decision" and our role is to be the "neutral arbiter of matters the parties present." *Greenlaw*, 554 U.S. at 243. But apparently party presentation no longer matters here. Everything is on the table—perhaps due to views previously expressed. *See Kerr v. Hickenlooper*, 759 F.3d 1186, 1186 (10th Cir. 2014) (Hartz, J., dissenting from denial of rehearing en banc) ("[T]he Guarantee Clause claim is nonjusticiable as a political question."); *id.* at 1191 (Tymkovich, J., dissenting from denial of rehearing en banc) ("Guarantee Clause challenges to statewide direct democracy provisions, like TABOR, are non-justiciable.").

That is a mistake.

Our adversarial system endows the parties with the opportunity—and duty—to craft their own legal theories for relief in the district court. It is the significant but limited job of our appellate system to correct errors made by

_____

[13] The *Kerr II* panel, after reversing *Kerr I*'s standing determination for the legislator plaintiffs, declined to reconsider its conclusion on the political question doctrine. But in remanding to the district court to consider whether any plaintiff had standing, the *Kerr II* panel instructed that the district court "may . . . consider [whether any] other justiciability hurdles" remained if it found that any plaintiff had standing. *Kerr v. Hickenlooper*, 824 F.3d 1207, 1217 (10th Cir. 2016) (*Kerr II*). On remand, the Governor did not present any argument on such justiciability hurdles like the political question theory. He argued only that the non-legislator plaintiffs lacked standing—the issue on appeal in *Kerr III* and this en banc proceeding.

27

the district court in assessing the legal theories presented to it, not to serve as a second-shot forum . . . where secondary, back-up theories may be mounted for the first time.

*Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011) (Gorsuch, J.) (internal quotations omitted).

What is more, in the nearly one hundred and fifty pages of briefing filed in this appeal and en banc rehearing, there is only a single page from the Governor and a page and a half in response from the plaintiffs on the political question doctrine, mostly quibbling about whether a comment in *Rucho v. Common Cause*, 139 S. Ct. 2484, 2506 (2019), was dicta or not. *See* Gov. Supp. Br. at 16; Aplt. Supp. Resp. Br. at 18–19; *see also* Gov. Supp. Reply Br. at 9–10 (reiterating the same arguments).[14] That is hardly the adversarial process at work. Although we must ensure ourselves of our own jurisdiction, "appellate courts do not sit as self-directed boards of legal inquiry and research." *Nat'l Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 147 n.10 (2011) (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (Scalia, J.)). "[W]e depend on the adversarial process to test the issues for our decision." *Aposhian v. Wilkinson*, 989 F.3d 890, 897 (10th Cir. 2021) (Tymkovich, C.J., dissenting from denial of rehearing en banc)

---

[14] Of note, our en banc briefing order focused only on the political subdivision "standing" doctrine, not the political question doctrine. Although the order was the product of the en banc court, no member of the en banc court identified the political question doctrine as relevant to this appeal or requiring supplemental briefing. Instead, our order asked the parties to file supplemental briefs answering two questions (with three sub-questions each) focused on subdivision "standing" in no more than twenty pages. The Governor's choice to toss in a single page regarding the political question doctrine short-circuited the adversarial process. It forced the plaintiffs to briefly respond in addition to answering all the other questions from the en banc order.

28

(internal quotations omitted). To bypass a fully developed adversarial process and rule based only on our own view of the law risks an erroneous result, particularly in this case, given the "[d]eeply rooted ambiguity in the nature and justification of the political question doctrine." *Schroder*, 263 F.3d at 1171 n.1.

To respect the parties' control of their own case and to ensure that any decision we render is the product of adversarial refinement, I would confine our analysis to the issues the parties have focused on, not issues newly raised by the court sua sponte.

**V**

I concur in ruling that the district court erred in dismissing this case under Rule 12(b)(1) for lack of subject matter jurisdiction. I respectfully dissent from our converting the Governor's motion to a Rule 12(b)(6) motion and dismissing this case on the merits. I also would not convert the dismissal without prejudice into one with prejudice, nor would I sua sponte raise the political question doctrine. I would reverse the district court's Rule 12(b)(1) ruling and remand for further proceedings.